JOHN CASTELLO, Indiv. and as Special Adm'r of the Estate of Vivianne Castello, Deceased, Plaintiff-Appellant, v. OLGA KALIS, Defendant-Appellee (Thomas A. Korman, as Special Representative of the Estate of Robert Turner, *et al.*, Defendants).

First District (2nd Division)   No. 1—03—0840

Opinion filed September 14, 2004.

Propes & Kaveny, of Chicago (Lorna E. Propes, Elizabeth A. Kaveny, and David R. Nordwall, of counsel), for appellant.

Baker & Enright, of Chicago (Ruth V. Enright and Patrick J. Vezino, of counsel), for appellee.

PRESIDING JUSTICE BURKE delivered the opinion of the court:
Plaintiff John Castello appeals from an order of the circuit court granting defendant Olga Kalis' motion for summary judgment in plaintiff's negligence action against defendants. On appeal, plaintiff contends that the trial court erred in holding that the claims against Kalis[1] were time-barred as a matter of law under the applicable statute of limitations. For the reasons set forth below, we affirm.

## STATEMENT OF FACTS

In 1988, Vivianne Castello began receiving routine gynecologic and obstetrical care from Dr. Joseph Capezio, Dr. Robert Turner and the practice group of Women's Health Specialists. In January and November 1992, Vivianne's Pap smear slides were forwarded to Cytology Unlimited (Cytology) and reported as normal. Likewise, in September 1993, Vivianne's Pap smear slide was forwarded to Cytology, and defendant, a cytotechnologist employed by Cytology, interpreted and reported the slide to be within normal limits. In April 1996, Vivianne had another Pap smear taken and the slide was again reported by Cytology as normal.

In July 1996, Vivianne experienced bleeding following sexual intercourse. In August, she contacted Women's Health Specialists regarding the bleeding and expressed to Drs. Capezio and Turner her concern that the bleeding was indicative of cervical cancer. Vivianne was repeatedly reassured by her doctors that she was not a candidate for cervical cancer and that cancer was not the source of her irregular bleeding. By January 1997, Vivianne's symptoms were becoming more

---

[1] Kalis is the only defendant who is a party to this appeal and is identified hereinafter as defendant.

severe, and she was experiencing bleeding with other activities, such as heavy lifting. Vivianne complained regularly to Capezio and Turner that she was concerned that she might have cervical cancer based on various medical books she had read regarding abnormal bleeding. Vivianne had another Pap smear taken in early 1997 and Cytology once again reported that the slide was normal. The physicians repeatedly told Vivianne to stop worrying about the possibility of cervical cancer, noting that she was too young for cervical cancer and that her prior Pap smears contained normal results.

Finally, Turner recommended that Vivianne undergo a cervical biopsy on February 27, 1997. On March 3, Turner advised Vivianne that the biopsy showed that she had cervical cancer and he recommended that she see Dr. James Dolan, an oncologist. In response to subsequent interrogatories, Vivianne stated that March 3, 1997, was the date that she "became aware of the alleged malpractice stated in [her] Complaint."

Vivianne followed up with Dr. Dolan the very next day. Dolan told Vivianne that she had a four-centimeter lesion on her cervix, which "[wa]s basically the entire cervix." Dolan informed her that she had a very aggressive, fast-growing cancer, estimated that her life expectancy could be as little as 30 months and questioned why the biopsy had not been given sooner. Thereafter, Vivianne had to undergo a radical hysterectomy.

On April 2, 1997, Vivianne requested copies of her entire medical file from Women's Health Specialists. Vivianne also requested that Dr. Turner call her regarding a rereading of her previous Pap smears. Vivianne subsequently alleged in an eight-page statement dated May 1997 that, when Turner returned her telephone call on April 2, he told Vivianne's husband, plaintiff John Castello, that another physician, Dr. Taxi, had reviewed one or more of Vivianne's previous Pap smear slides and had determined that "[her] previous pap's [sic] showed cancer." In a subsequent deposition, plaintiff corroborated Vivianne's statement concerning Turner's telephone call.

When Vivianne called the Women's Health Specialists office on April 8, 1997, the nurse informed her that there were no written confirmations of Dr. Taxi's alleged findings. When Vivianne arrived at the office later that day to retrieve her medical records, the nurse told Vivianne that she had spoken with Dr. Turner and that Turner had denied telling plaintiff that Taxi had reread the Pap smear slides. Vivianne was then told that her slides had not been reviewed.

In April 1997, Vivianne and plaintiff retained an attorney. In a later discovery deposition, plaintiff was questioned as to why he and his wife sought legal counsel. Plaintiff responded, "[I]t goes back to

the slides, that we were told they were fine and [subsequently] learned that they had cancer on them ***." On April 22, Vivianne's attorneys requested her Pap smear slides from Cytology. Vivianne's January 1992, November 1992, September 1993, April 1996 and January 1997 slides were produced by Cytology on April 30, 1997.

In May 1997, Vivianne drafted an eight-page statement regarding her case, in which she stated:

> "I feel that [Turner and Capezio] should have taken me a little more seriously since I had all the warning signs of Cervical Cancer [*sic*]. Everything I read in medical books suggested cervical cancer. *** I continually questioned them about the possibility *** but was continually assured that I had nothing to worry about. They should have done the proper testing such as an earlier [P]ap smear. Due to the controversy about the reliability of [P]ap smears, a biopsy should have been done at an earlier date ***. *** By their failure to diagnose sooner, I have had to undergo surgery with many side effects at a young age."

On the Fourth of July weekend in 1997, Vivianne and her family were on vacation when Vivianne casually met Dr. Stephen Cruikshank, a gynecologist, who criticized the medical care she had received leading up to her diagnosis of cancer. Cruikshank thought that she should have had a biopsy much sooner and ultimately testified as an expert witness at trial.

On April 17, 1998, Vivianne filed a complaint against Turner, Capezio and Women's Health Specialists, alleging that Turner and Capezio were negligent in failing to properly and thoroughly investigate her repeated complaints of vaginal bleeding from August 1996 to February 1997 and that, as a result of their negligence, she suffered "a significant delay in the diagnosis [of] cervical cancer."

In July 1998, Vivianne traveled, with all of her Pap smear slides, to receive treatment from M.D. Anderson Cancer Center in Houston, Texas. While at the cancer center, Dr. Ruth Katz, a pathologist, reported to Vivianne that her 1996 Pap slide showed atypical cells and that the 1997 Pap smear slide indicated cervical cancer. It is unclear from a review of the record whether Vivianne was given any information concerning her 1992 and 1993 Pap smear slides. Although the report from the M.D. Anderson Cancer Center shows that the Pap smear slides from 1992, 1993, 1996 and 1997 were present and inventoried, under the identification numbers for the slides from 1992 and 1993, the report contains the information "no diagnosis rendered" as to the 1992 and 1993 slides. Also, under the identification number for the 1993 slide, the report states, "See comment." The comment on the bottom of that page states, "There are a few cells that show features of atypical immature metaplasia."

On October 20, 1998, Vivianne filed a first amended complaint, adding as defendants Cytology and Dr. Anthony Dombrowski, a pathologist employed by Cytology. Vivianne alleged that Dombrowski was negligent in failing to detect or diagnose atypical cells in her 1996 Pap smear and squamous cells in her 1997 Pap smear and in incorrectly reporting that the 1996 and 1997 smears were within normal limits. On February 17, Vivianne filed a second amended complaint, adding as a defendant Rena Levy, a cytotechnologist employed by Cytology. Vivianne alleged that Levy was negligent in failing to detect or diagnose atypical cells in her 1996 Pap smear and in incorrectly classifying the 1996 Pap smear as within normal limits. Vivianne also alleged that, as a result of Dombrowski and Levy's actions, she suffered a "significant delay in the diagnosis [of] cervical cancer."

On November 10, 1999, Vivianne died from cancer. On February 17, 2000, a third amended complaint was filed to reflect Vivianne's death, naming plaintiff as special administrator of her estate and adding claims of wrongful death, survival, and loss of consortium against all defendants.

In June 2000, in an apparent attempt to establish a baseline in preparation for trial, plaintiff's pathology expert reviewed the 1993 Pap smear slide. The expert subsequently provided plaintiff's counsel with a report, stating that the 1993 slide, among other things, "demonstrated atypical immature metaplasia." On July 12, plaintiff filed a fourth amended complaint, alleging claims of wrongful death, survival, and loss of consortium against defendant, the cytotechnologist who read and interpreted the 1993 slide. Plaintiff alleged that defendant was negligent in, *inter alia*, failing to identify or appreciate the significance of atypical immature metaplasia in the 1993 Pap smear and in incorrectly classifying the smear as within normal limits. Plaintiff further alleged that, as a result of defendant's negligence, Vivianne suffered "a significant delay in the diagnosis [of] cervical cancer." Plaintiff also alleged that he did not discover defendant's negligence until June 2000.

On August 31, 2000, defendant filed a motion to dismiss plaintiff's fourth amended complaint, arguing that the claims against her were time barred by the statute of limitations. Defendant also argued that plaintiff had failed to allege any facts supporting that the date of discovery of the injury and its wrongful cause was June 20, 2000, or denying that the discovery date could not have been at an earlier date.

On January 16, 2001, a hearing on defendant's motion to dismiss was held before Judge Philip Bronstein. During the hearing, the following colloquy occurred:

"MS. KAVENY [Plaintiff's attorney]: *** [I]t was inconceivable [to Vivianne] that she had had the cancer in 1993, and it had never been diagnosed.

The slide wasn't read in that context.

We were looking at the 1996 slide and the 1997 slide because there was a complaint filed against those.

THE COURT: Yes, for all of [the slides]. Did you not receive all of [the slides]?

MS. KAVENY: We did receive all of them.

THE COURT: That was back in 1997.

* * *

THE COURT: This thing runs indefinitely.

'Well, we looked at the 1997, we asked for all the slides, apparently we only looked at the latest slide.'

Who would do such a thing?

MS. KAVENY: [Y]our Honor, we did first raise this pathology case and first examined the slides and first sue [sic] people based upon these slides in October of 1998.

THE COURT: Right, and you say it was in October *** but that's not what you claim. You claim she doesn't have knowledge until June of 2000.

All I'm suggesting is that the facts here say you're wrong. You didn't plead any earlier date. It can't be.
***

You sued Cytology. How could it be that your cause of action didn't accrue where you asked for the slides, and you actually felt that they were the culpable party.

* * *

THE COURT: I asked you when you alleged the discovery rule, and you told me June of 2000.
***

It can't be June, 2000."

Thereafter, the trial court granted plaintiff's motion for leave to file an amended complaint to allege a new discovery date and, in so doing, did not address defendant's argument that plaintiff's claims against her were time barred as a matter of law.

On January 30, 2001, plaintiff filed a fifth amended complaint. Plaintiff alleged that Vivianne first discovered that the 1996 and 1997 Pap smear slides had been incorrectly classified as within normal limits during the week of July 13, 1998, and that, on or about June 20, 2000, plaintiff's counsel received a written expert's report stating that the 1993 Pap smear slide exhibited cancerous cells. On February 13, defendant again moved to dismiss plaintiff's complaint based on

the statute of limitations. At a hearing on defendant's motion, plaintiff argued that he "allege[d] several dates [in his complaint] which may trigger the discovery rule," and that the determination of the discovery date was a question of fact. On March 26, the trial court (Judge Martin Agran) denied defendant's motion.

The case was set for trial on January 2, 2003. On November 13, 2002, defendant filed a motion for summary judgment, arguing that the statute of limitations barred plaintiff's claims against her because the discovery date, at the very latest, was some date prior to November 10, 1997, exactly two years before Vivianne's death. After a hearing on the motion, the trial court (Judge David Lichtenstein) granted defendant's motion. On December 26, plaintiff filed an emergency motion for assignment of the case to a trial judge *instanter* and for a rehearing on defendant's motion for summary judgment. The motion was entered and continued for hearing once the case was assigned to a trial judge.

On January 2, 2003, the case was assigned to a trial judge and plaintiff filed a sixth amended complaint to reflect claims dropped against certain settling defendants. The trial court (Judge James Quinlan), after conducting a rehearing on defendant's motion for summary judgment, stated:

"I have come to the conclusion that the statute of limitations started to run and that the *** decedent *** knew or should have known that—well, she knew she had cancer definitely on March 3rd, 1997. Is there any doubt about that? It's sort of uncontested.

And I think that she knew or should have known that it was wrongfully caused at some time and maybe at all times between that time and her conversation with Dr. Cruikshank in July of that year.

I mean, we've got her statement *** in which she recites a history of what she knew or what she thought. And we've got her interview or meeting with Cruikshank in July of '97.

So I think the statute started to run no later than that meeting with Cruikshank. And therefore, I'm going to sustain the [defendant's] motion."

The case then went to trial against the remaining defendants.

This appeal followed.

## ANALYSIS

Plaintiff contends that the determination of when the statute of limitations period commenced for plaintiff's claims against defendant was a question of fact, and, as such, the trial court erred in granting defendant's motion for summary judgment. Plaintiff argues that the trial court's ruling granting defendant's motion wrongly focused upon

Vivianne's discovery of her injuries arising out of the negligence in 1996 and 1997, and not her discovery of her injury in 1993. Plaintiff therefore argues that a genuine issue of material fact existed as to when Vivianne should have known about the 1993 injury and its wrongful causation, thereby precluding the granting of summary judgment.

Defendant contends that the undisputed facts established, as a matter of law, that plaintiff's claims were time barred. Defendant argues that there was only one injury here, which was a delay in the diagnosis of cervical cancer, and that Vivianne knew her injury was wrongfully caused before November 9, 1997, two years prior to her death. Defendant further argues that, even though plaintiff contends that Vivianne did not know that defendant's alleged negligence in reading the 1993 Pap smear slide contributed to Vivianne's injury, the term "wrongfully caused" does not include knowledge of a *specific* defendant's conduct, *i.e.*, defendant's conduct. Defendant maintains that once Vivianne knew that her injury was wrongfully caused, she had a duty to investigate all possible theories of liability which may have flowed from the delay in diagnosing cervical cancer, and that this included a duty to investigate her previous Pap smear slides.

Summary judgment is a drastic means of disposing of litigation and, as such, the right of the moving party to obtain summary judgment must be clear and free of doubt. *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240, 249, 633 N.E.2d 627 (1994). Summary judgment "shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c)) (West 2002). In deciding whether a ruling for summary judgment is appropriate, we construe the record strictly against the movant and liberally in favor of the nonmoving party. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113, 649 N.E.2d 1323 (1995). The trial court's decision to grant a motion for summary judgment is reviewed *de novo*. *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 319-20, 786 N.E.2d 161 (2003).

■ Plaintiff's claims for wrongful death, survival and loss of consortium against defendant will lie only if Vivianne's death occurred prior to the expiration of the statute of limitations period. See *Beetle v. Wal-mart Associates, Inc.*, 326 Ill. App. 3d 528, 533, 761 N.E.2d 364 (2001) ("Illinois courts interpreting the [Wrongful Death] Act have long found that a wrongful death action will lie only where the deceased had a claim that was not time-barred on or before his death"); 735 ILCS 5/13—209(a)(1) (West 2000) (with respect to

survival claims, if a person entitled to bring an action dies before the expiration of the statute of limitations for that action, an action may be commenced by the representative before the expiration of that time or within one year from the decedent's death, whichever date is later); 735 ILCS 5/13—203 (West 2002) (actions for damages for loss of consortium shall be commenced within the same period of time as actions for damages for injury to such other person). Section 13—202 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/13—202 (West 2000)), the applicable statute of limitations in this case, states that an action for damages based on an injury to the person must be commenced within two years after the cause of action accrued. 735 ILCS 5/13—202 (West 2002). Thus, as the parties here concede, the question on appeal is whether we can determine, as a matter of law, that the two-year statute of limitations, as applied to Vivianne, began to run against defendant before November 10, 1997, exactly two years prior to Vivianne's death.

■ The "discovery rule" applies to section 13—202 of the Code and has the effect of postponing the commencement of the statute of limitations "until the injured plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 360-61, 657 N.E.2d 894 (1995). See also *Witherell v. Weimer*, 85 Ill. 2d 146, 156, 421 N.E.2d 869 (1981); *Hoffman v. Orthopedic Systems, Inc.*, 327 Ill. App. 3d 1004, 1008, 765 N.E.2d 116 (2002); *Saunders v. Klungboonkrong*, 150 Ill. App. 3d 56, 59 501 N.E.2d 882 (1986). The discovery rule was created to alleviate the harsh consequences that would follow from the general rule that a cause of action for personal injuries "accrues" when the plaintiff suffers an injury. *Golla*, 167 Ill. 2d at 360. In most instances, the time at which a plaintiff knows or reasonably should have known both of the injury and that it was wrongfully caused will be a disputed question of fact. *Witherell*, 85 Ill. 2d at 156. However, "[w]here it is apparent from the undisputed facts *** that only one conclusion can be drawn, the question becomes one for the court," and can be resolved as a matter of law, making summary judgment on statute of limitation grounds appropriate. *Witherell*, 85 Ill. 2d at 156. See also *Hoffman*, 327 Ill. App. 3d at 1008; *Saunders*, 150 Ill. App. 3d at 61.

■ "The phrase 'wrongfully caused' does not mean knowledge of a *specific* defendant's negligent conduct or knowledge of the existence of a cause of action." (Emphasis added.) *Young v. McKiegue*, 303 Ill. App. 3d 380, 388, 708 N.E.2d 493 (1999). See also *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 415, 430 N.E.2d 976 (1981); *Saunders*, 150 Ill. App. 3d at 60; *Hoffman*, 327 Ill. App. 3d at 1011. Rather, the term

refers to when an injured party "becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Knox College*, 88 Ill. 2d at 416. See also *Young*, 303 Ill. App. 3d at 388. Stated another way, "[t]he limitations period begins to run when the plaintiff becomes aware that the cause of his problem stems from another's negligence and not from natural causes." *Saunders*, 150 Ill. App. 3d at 60. The law is well settled that once a party knows or reasonably should know both of his injury and that it was wrongfully caused, "the burden is upon the injured person to inquire further as to the existence of a cause of action." *Witherell*, 85 Ill. 2d at 156. See also *Knox College*, 88 Ill. 2d at 416; *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 171 (1981) (stating the above proposition and adding that, "once it reasonably appears that an injury was wrongfully caused, the party may not slumber on his rights").

In *Wells v. Travis*, 284 Ill. App. 3d 282, 672 N.E.2d 789 (1996), the decedent had been admitted to a hospital on February 7, 1991, after being referred by his family physician to Dr. Karim Valika. *Wells*, 284 Ill. App. 3d at 284. On February 8, Valika diagnosed the decedent as suffering from, among other things, diabetes mellitus. *Wells*, 284 Ill. App. 3d at 284. The decedent died in the hospital on February 10 from "multiple complications." *Wells*, 284 Ill. App. 3d at 284. The plaintiff filed an action for medical negligence against the decedent's family physician on February 3, 1993, alleging that he was negligent in "fail[ing] to diagnose and treat diabetes mellitus that resulted in decedent's death." *Wells*, 284 Ill. App. 3d at 284. Attached to the plaintiff's complaint was a written health professional's report, dated August 21, 1992, which indicated that the plaintiff's expert had reviewed the decedent's treatment records " 'from 1983 through the time of his death, including his stay in *** [the] [h]ospital,' " and criticized the family physician's departure from good medical care in failing to diagnose the decedent before his hospitalization on February 7, 1991. *Wells*, 284 Ill. App. 3d at 284. The report also stated that there was no malpractice involved in the decedent's care " 'once he was admitted to the hospital since he [had] developed complications that [could have] occur[red] despite the best of treatment [at the hospital].' " *Wells*, 284 Ill. App. 3d at 284.

In depositions taken on December 22 and 24, 1994, the family physician's defense experts each criticized the medical care rendered by Valika, claiming that he had deviated from the standard of care in his treatment of the decedent while at the hospital. *Wells*, 284 Ill. App. 3d at 285. Following the depositions, the plaintiff filed an amended complaint on January 19, 1995, adding Valika as a defendant and al-

leging that the dates of the December 1994 depositions were the first dates that she knew or reasonably should have known that Valika wrongfully caused the decedent's death. *Wells,* 284 Ill. App. 3d at 285. Thereafter, Valika filed a motion to dismiss, arguing that the applicable two-year statute of limitations barred the plaintiff's claim, which the trial court granted. *Wells,* 284 Ill. App. 3d at 284.

On appeal, the plaintiff argued that she had no reason to know of her claim against Valika before the December 1994 depositions, particularly in view of the expert's report, which exonerated all personnel who treated the decedent in the hospital, including Valika. *Wells,* 284 Ill. App. 3d at 286. Thus, the plaintiff contended that her complaint was timely filed within two years of the December 1994 depositions. *Wells,* 284 Ill. App. 3d at 286. The *Wells* court affirmed the trial court's dismissal of the plaintiff's claim against Valika, stating:

"The essence of plaintiff's position is that a person is not charged with knowledge sufficient to trigger the running of the limitations period as to any particular defendant until the person knows or reasonably should know that the injury was wrongfully caused by the negligence *of that defendant.* The supreme court has expressly disavowed any such interpretation of the discovery rule ***. ***

Knowledge that an injury has been 'wrongfully caused' does not mean knowledge of a specific defendant's negligent conduct. [Citations.] We believe that the rejection of this fundamental principle, as urged by plaintiff ***, would represent an unwarranted departure from existing precedent.

The injury complained of in this case is the death of decedent. It is evident that plaintiff had reason to know of the death and that actionable conduct might be involved when plaintiff received the August 21, 1992, report of [the expert] implicating [the family physician] and, after reviewing records of decedent's hospital treatment, exculpating Valika as a negligent party. As a matter of law, therefore, the limitations period commenced on that date. ***

* * *

*** [P]laintiff cannot be heard to argue that she did not possess sufficient knowledge on August 21, 1992, concerning the death and its cause to put a reasonable person on inquiry to determine whether actionable conduct was involved, when it is undisputed that she was in possession of the report of her own expert concluding that the conduct of [the family physician] departed from acceptable medical standards. *** [S]uch knowledge must *** be presumed from plaintiff's awareness of her *** expert's report criticizing departures from the proper standard of medical care, regardless of whom the expert identified as a responsible party. The plaintiff had two years from the date of her expert's report to

conduct her inquiry to determine whether, and against whom, a lawsuit could be filed. If plaintiff was unsatisfied that [the expert] had correctly identified all persons responsible for the alleged malpractice, she had two years to conduct further inquiry or to consult any other expert." (Emphasis in original.) *Wells*, 284 Ill. App. 3d at 287-89.

In *Hoffman*, the plaintiff underwent back surgery on September 27, 1995, after being told that the procedure was to be "fairly simple." *Hoffman*, 327 Ill. App. 3d at 1006. When the plaintiff awoke after the surgery, she was told that " 'everything that could go wrong went wrong' " and that she had liver failure, kidney failure, gastrointestinal bleeding, pneumonia, a heart arrhythmia and septicemia. *Hoffman*, 327 Ill. App. 3d at 1006. When the plaintiff asked for an explanation as to her condition, she was given " 'a different story from everybody.' " *Hoffman*, 327 Ill. App. 3d at 1007. Approximately four to six months after her surgery, the plaintiff asked her attorney to investigate whether there was "any doctor malpractice" involved in the surgery. *Hoffman*, 327 Ill. App. 3d at 1007.

On April 23, 1998, the plaintiff returned to the same hospital for knee surgery and was told by her anesthesiologist that an internal hospital investigation had been conducted regarding her September 27 surgery and the investigation found that the operating table upon which she had been positioned caused the complications during her 1995 surgery. *Hoffman*, 327 Ill. App. 3d at 1007. The plaintiff, after learning that her injuries were caused by the operating table, filed a lawsuit on May 7, 1998, against the manufacturer of the table, alleging that the table was not reasonably safe in design or manufacture, and the surgeon and the hospital, alleging that they both failed to properly position and monitor her on the table. *Hoffman*, 327 Ill. App. 3d at 1008.

On November 22, 2000, the manufacturer of the operating table filed a motion for summary judgment, arguing that the plaintiff's action was time-barred, which the trial court granted, finding that "the lawsuit was filed beyond the applicable [two-year] statute of limitations." *Hoffman*, 327 Ill. App. 3d at 1008. The plaintiff appealed, arguing that summary judgment was improper because the statute did not begin to run until the "claimant [wa]s aware of the injury and its source" and a genuine issue of material fact existed as to when she knew or should have known that her injury was wrongfully caused. *Hoffman*, 327 Ill. App. 3d at 1008.

On appeal, the *Hoffman* court stated:

"[For purposes of commencing the statute of limitations period, the plaintiff's] own reported conversations with medical personnel and

> her retention of an attorney to investigate demonstrated that she knew she had suffered an injury and that the injury may have been wrongfully caused. [Citation.] *** Although her suspicion of wrongful causation was limited to an investigation as to whether medical malpractice was committed, rather than whether a product liability action existed, as the cases hold, the term, 'wrongfully caused,' does not mean knowledge by plaintiff of a specific defendant's negligent act ***. ***
>
> Plaintiff's failure to pursue a more thorough inquiry to find the cause of her injuries does not excuse her from failing to comply with the statute of limitations." *Hoffman*, 327 Ill. App. 3d at 1010-11.

Thus, although never expressly specifying an exact date, the *Hoffman* court found that, when considering the circumstances surrounding the plaintiff's surgery, her subsequent conversations and the retention of an attorney, the statute of limitations commenced, at the very latest, six months after her 1995 operation. Accordingly, the *Hoffman* court held that the trial court did not err in granting the manufacturer's motion for summary judgment.

In the instant case, the injury complained of was "a significant delay in the diagnosis [of] cervical cancer," which resulted in Vivianne having a four-centimeter lesion on her cervix, necessitated a radical hysterectomy and ultimately resulted in Vivianne's death. The undisputed facts show that Vivianne received several Pap smears during the course of her treatment at Women's Health Specialists and that each of the Pap smear slides was reported as within normal limits, even though Vivianne began experiencing bleeding in July 1996. By late 1996, Vivianne was experiencing severe bleeding, complained regularly to her doctors and repeatedly expressed her fears that the bleeding was indicative of cervical cancer, yet Vivianne's doctors and Pap smear results continued to contradict her symptoms and fears. The record further shows that, as late as the beginning of 1997,[2] Vivianne had another Pap smear taken, which was reported again as within the normal limits. Then, after her February 1997 biopsy, Vivianne was told on March 3, 1997, that she had cervical cancer, and, on the following day, she was told that she had a four-centimeter lesion on "basically the entire cervix" and that, due to her advanced state of cervical cancer, her life expectancy could be as little as 30 months. There can be little doubt that, at this time, Vivianne knew, or reasonably should have known, that she had suffered an injury and that this injury was wrongfully caused. Moreover, Vivianne's interrogatories

---

[2]The record does not include the exact date of this Pap smear.

reveal that Vivianne *knew*, subjectively, on March 3 that she had suffered an injury and that the injury was wrongfully caused because Vivianne stated that March 3 was the date that she "became aware of the alleged malpractice stated in the complaint."

Further, a review of the record reveals that, by November 9, 1997 (the agreed last date for when the statute of limitations could have begun to run regarding plaintiff's claims), Vivianne had requested her entire medical file from Women's Health Specialists. Additionally, Vivianne contended that plaintiff had spoken to Dr. Turner over the telephone during which Turner admitted that the "previous pap's [*sic*] showed cancer." Thereafter, Vivianne and plaintiff retained an attorney, and plaintiff, when asked in a deposition why he and Vivianne sought an attorney, responded that "it [went] back to the slides, that we were told that they were fine and [later] learned that they had cancer on them." Also, Vivianne's attorney had requested and received all of the Pap smear slides from Cytology; Vivianne had written an eight-page statement criticizing the conduct of Drs. Capezio and Turner and acknowledging "the controversy about the reliability of [P]ap smears"; and Vivianne had spoken to Dr. Cruikshank, during which Cruikshank criticized the medical care she had received leading up to her diagnosis of cancer.

■ Like the plaintiff in *Wells*, the essence of plaintiff's position here is that Vivianne should not have been charged with knowledge sufficient to trigger the running of the limitations period as to any particular defendant until she knew or reasonably should have known that her injury was wrongfully caused by *that defendant*. As stated in *Wells*, our supreme court has expressly disavowed any such interpretation of the discovery rule. Similar to the plaintiff in *Wells*, plaintiff here cannot be heard to argue that Vivianne did not possess sufficient knowledge by November 9, 1997, concerning her injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct was involved in light of the fact that it is undisputed as to how the above events unfolded. Such knowledge must be presumed from the timing and facts surrounding Vivianne's diagnosis of cervical cancer on March 3, 1997, her statement acknowledging her awareness on March 3 of alleged malpractice, her statements claiming that Dr. Turner told her husband that the previous Pap smear slides showed cancer, her requests for her medical files and Pap smear slides, her retention of an attorney and her statement concerning the reliability of Pap smear slides. Like the *Wells* court, we find that this knowledge must be presumed regardless of whom Vivianne identified as the responsible party. Like the plaintiff in *Wells*, if Vivianne had not been satisfied that all persons had been correctly identified as contributing

to her injury, she had two years to conduct further inquiry as to the sources of her injury.

Additionally, we find that, even if Vivianne's initial inquiry was limited to an investigation of wrongful conduct by Drs. Turner and Capezio, rather than an investigation into the results of the Pap smear slides, as Illinois cases hold, the term "wrongfully caused" does not mean knowledge by a plaintiff of a specific defendant's negligent act. Vivianne's failure to pursue a more thorough inquiry to find the cause of her injury, like the plaintiff in *Hoffman*, does not excuse her failure to comply with the statute of limitations. See *Hoffman*, 327 Ill. App. 3d at 1011. Thus, we conclude that, as a matter of law, the statute of limitations began to run by November 9, 1997, because, at this point, Vivianne knew or should have reasonably known that she suffered an injury and that the injury was wrongfully caused. Stated another way, the limitations period began to run, as a matter of law, by November 9 because Vivianne was aware by that date that the cause of her problems stemmed from another's negligence and not from natural causes. Thus, by November 9, Vivianne had the burden to inquire further as to the existence of her cause of action. The two-year statute of limitations expired by November 10, 1999, and plaintiff did not file his claims against defendant until July 12, 2000. Accordingly, we find that plaintiff's claims were barred by the statute of limitations and, therefore, that the trial court properly granted defendant's motion for summary judgment.

We briefly note that plaintiff devotes a significant portion of his argument to contrasting situations in which there was a sudden traumatic event causing an injury with situations in which there was an aggravation of a physical problem, which may naturally develop absent negligent causes, and maintains that *Hoffman* is distinguishable because that case involved a sudden traumatic event. Plaintiff argues that, because Vivianne's injury was an aggravation of a physical problem which may have naturally developed absent negligent causes, she should not have been expected to immediately know of either its existence or its potential wrongful cause.

Contrary to plaintiff's argument, the mere fact that the injury in *Hoffman* could have been classified as a sudden traumatic event does not mean that the reasoning in *Hoffman* does not apply in our case. As the court stated in *Clark v. Galen Hospital Illinois, Inc.*, 322 Ill. App. 3d 64, 748 N.E.2d 1238 (2001):

> "[T]he classification of an injury as traumatic or nontraumatic, alone, is of no significance. [Citation.] The only benefit to be derived from such a classification would be in determining when the plaintiff discovered, or should have discovered, that the injury was

caused by wrongful conduct. [Citations.] The more obvious the injury, the more easily a plaintiff should be able to determine its cause." *Clark*, 322 Ill. App. 3d at 72.

See also *Pszenny v. General Electric Co.*, 132 Ill. App. 3d 964, 966, 478 N.E.2d 485 (1985) (stating that "[t]he classification of an injury as 'traumatic' or 'nontraumatic' merely aids in the determination of when the plaintiff discovered, or should have discovered, that the injury was caused by the wrongful conduct of a defendant"). Thus, regardless of how Vivianne's injury is classified here, such an obvious injury—being told of a four-centimeter lesion and the possibility of having as little as 30 months to live after being told recently and repeatedly that there was no possibility of cervical cancer—makes it easier to determine that by November 9, 1997, at the very latest, Vivianne knew, or reasonably should have known, that her injury was wrongfully caused.

We also note that, during oral argument, plaintiff argued that our decisions in *Young* and *Clark* are controlling in the instant case and implied that a finding for defendant here would be inconsistent with that precedent. However, we find no inconsistencies between *Young* and *Clark* and the instant case. In *Young*, the decedent, who was suffering from pneumonia, had been hospitalized for 10 days and died purportedly due to complications from pneumonia on September 4, 1993. *Young*, 303 Ill. App. 3d at 382-83. Subsequent to the decedent's death, the plaintiff, the decedent's wife, ordered an autopsy because she " 'suspected [that] inappropriate medical care may have contributed to [her husband's] death.' " *Young*, 303 Ill. App. 3d at 383. The autopsy reported that the cause of the decedent's death was pulmonary edema brought about by pneumonia (*Young*, 303 Ill. App. 3d at 383), thereby suggesting that the death was from natural causes. The plaintiff subsequently contacted her attorney and then requested a copy of the medical records on October 20, 1993. *Young*, 303 Ill. App. 3d at 384. In December 1993, the plaintiff received the medical records and retained her attorney. *Young*, 303 Ill. App. 3d at 383-84. The plaintiff's attorney sent the medical records to two medical experts. *Young*, 303 Ill. App. 3d at 384. On or about August 17, 1994, the plaintiff's attorney received the first physician's written report, which concluded that " 'the physicians caring for [the decedent] deviated from the standard of care by not recognizing that his increasing respiratory distress *** was cardiac in nature.' " *Young*, 303 Ill. App. 3d at 384.

On March 3, 1995, the plaintiff filed a wrongful death action against the hospital and several of its doctors based on medical malpractice. *Young*, 303 Ill. App. 3d at 385. The plaintiff later filed

amended complaints on July 24 and November 6, 1996, and February 13, 1997, adding as defendants two other physicians and their employer (collectively, the defendants). In consolidated motions, the defendants filed motions to dismiss the claims against them based on the two-year statute of limitations applicable to medical malpractice actions, which the trial court granted. *Young*, 303 Ill. App. 3d at 385. The plaintiff appealed, and the defendants argued that the plaintiff knew or should have known that her husband's death was wrongfully caused in December 1993 when, after being suspicious of the care given to her husband, she received the hospital's medical records and retained a lawyer for purposes of investigating a lawsuit. *Young*, 303 Ill. App. 3d at 388. The defendants also argued alternatively that the plaintiff knew or should have known her husband's death was wrongfully caused in August of 1994 when her lawyer received the first physician's written report. *Young*, 303 Ill. App. 3d at 389.

The *Young* court held that the plaintiff knew or should have known that her husband's death was wrongfully caused no later than August 17, 1994, when her attorney received the first physician's written report, which clearly stated that the physicians caring for the decedent deviated from the standard of care. *Young*, 303 Ill. App. 3d at 389. Thus, the court held that, as a matter of law, the two-year statute of limitations commenced to run no later than when the first expert physician's report was received on August 17, 1994. *Young*, 303 Ill. App. 3d at 389. Accordingly, the *Young* court dismissed the plaintiff's claims against the defendants who were added as parties on November 6, 1996, and February 13, 1997. After dismissing these two defendants, the *Young* court then addressed whether it could determine, as a matter of law, that the plaintiff knew or should have known that her husband's death was "wrongfully caused" before August 17, 1994, for purposes of determining whether the claims against the defendant added on July 24, 1996, could be dismissed based on the statute of limitations. *Young*, 303 Ill. App. 3d at 390. The *Young* court found that even if the plaintiff "suspected" that the decedent may have received inappropriate medical care, retrieved the medical files from the hospital and retained an attorney, it could not say as a matter of law that the statute of limitations began to run at that point; the plaintiff had also been told that the decedent had died from complications from pneumonia, *i.e.*, natural causes, and an autopsy report had confirmed this. *Young*, 303 Ill. App. 3d at 383, 390. Thus, the *Young* court concluded that an issue of fact still remained as to whether the plaintiff possessed the requisite knowledge that the injury was "wrongfully caused" before she received the physician's report on August 17, 1994. *Young*, 303 Ill. App. 3d at 390.

The facts of *Young* are distinguishable from the facts of the instant case. In *Young*, although the plaintiff knew that she had suffered an injury (the decedent's death), it could not be stated that, as a matter of law, she knew or should have reasonably known that the injury was wrongfully caused because the decedent was reported to have died merely from complications from pneumonia and the plaintiff only "suspected" that the decedent may have received inappropriate care. In the instant case, as stated above, there can be no doubt that when plaintiff was told she had a four-centimeter lesion and as little as 30 months to live, after being told less than two months earlier that she had nothing to worry about, she knew or reasonably should have known that she suffered an injury and that the injury was wrongfully caused.

*Clark* is similarly distinguishable, *i.e.*, the plaintiff was told that her baby died from natural causes. More specifically, in *Clark*, the court found that it was reasonable for the plaintiff mother to originally believe that the injury, her premature baby's death at the hospital, was due to nonnegligent causes, especially since she was told that her child died due to complications from its premature status. Thus, the *Clark* court could not find, as a matter of law, that the statute of limitations began to run on the date of the child's death. *Clark*, 322 Ill. App. 3d at 66.

Lastly, we note that plaintiff here asks us to focus not on "Vivianne['s] discovery of her injuries arising out of the negligence in 1996 and 1997," but, rather, to focus on the discovery of "her injuries suffered in 1993." Plaintiff argues that there were separate and distinct injuries in the instant case. However, plaintiff has cited no case law, nor has our research revealed any, that supports such an argument as it relates to the facts of this case. Like the *Wells* court, we believe that accepting plaintiff's argument would require us to reject the fundamental principle that knowledge that an injury has been "wrongfully caused" does not mean knowledge of a specific defendant's negligent conduct and would represent an unwarranted departure from existing precedent.

Moreover, we believe plaintiff's argument, that the 1993 injury was separate and distinct from the injuries that occurred in 1996 and 1997, is flawed. Notwithstanding plaintiff's arguments to the contrary, there was but one injury—a delay in the diagnosis of cervical cancer—which ultimately resulted in Vivianne's death. When plaintiff asks us to consider the alleged misreading of the 1993 Pap smear as a separate and distinct event from the events in 1996 and 1997, plaintiff mistakenly focuses, not on the injury here, but on the *separate acts* of negligence that ultimately contributed, in one way or another, to Vivi-

anne's injury. However, for purposes of determining when the statute of limitations period commenced, we are not concerned with the separate acts of negligence leading up to a plaintiff's injury, or to when those acts of negligence occurred, but, rather, are concerned with plaintiff's injury and when plaintiff learned that the injury was wrongfully caused. See *Turner v. Nama*, 294 Ill. App. 3d 19, 25, 689 N.E.2d 303 (1997) ("the distinction between the [statute of] repose period and the [statute of] limitations period is that the repose period is triggered by defendant's *wrongful act or omission* that causes the injury, whereas the limitations period is triggered by the patient's discovery of the *injury.*" (emphasis added)).

In summary, because the undisputed facts in the instant case show that the statute of limitations period commenced, at the very latest, by November 9, 1997, the two-year statute of limitations expired by November 10, 1999, and plaintiff did not file his claims against defendant until July 12, 2000, we find that the trial court did not err in granting defendant's motion for summary judgment since no genuine issue of material fact existed precluding summary judgment. See *Witherell*, 85 Ill. 2d at 156 ("Where it is apparent from the undisputed facts *** that only one conclusion can be drawn, the question becomes one for the court," making summary judgment on the statute of limitations grounds appropriate).

## CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CAHILL and WOLFSON, JJ., concur.