In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 07-1954

LENORE AEBISCHER,

*Plaintiff-Appellant,*

*v.*

STRYKER CORPORATION and
HOWMEDICA OSTEONICS CORPORATION,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 C 2121—**Michael P. McCuskey**, *Chief Judge.*

———————

ARGUED JANUARY 16, 2008—DECIDED AUGUST 1, 2008

———————

Before MANION, WOOD, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Lenore Aebischer's artificial hip
unexpectedly began to cause her pain less than four
years after it was implanted, and she soon underwent
surgery to replace it. After the surgery her doctor con-
cluded that the device had suffered "advanced or cata-
strophic failure." Aebischer sued the manufacturer and
its parent company, alleging that the product was defec-
tive, but the district court dismissed her lawsuit under
Illinois' two-year statute of limitations because Aebischer

had filed suit more than two years after learning that her hip would need to be replaced.

We reverse. The statute of limitations began to run only when Aebischer should have realized that her injury might have been wrongfully caused, and a jury could reasonably conclude that Aebischer filed suit within two years of that date. Accordingly, we remand the case for trial.

## I. Background

In December of 1997, Lenore Aebischer, then 44, underwent surgery to replace her left hip with a prosthetic device. Her doctor, Peter Bonutti, warned that prosthetic hips do not last forever, noting that she was at increased risk for wear because she was young and physically active. Still, he estimated that her new hip would last 15 to 20 years.

That estimate proved to be overly optimistic. In early 2001—less than four years after her hip replacement— Aebischer began to experience groin pain and had difficulty standing and walking. At first Dr. Bonutti did not know what was wrong, although he noted "small wear around the socket" and was concerned that she might have "osteolysis," a condition involving dissolution or degeneration of bone tissue that can be caused by wear or infection.

Aebischer continued to experience pain and returned to Dr. Bonutti several times for further evaluation. By January of 2002, Bonutti confirmed that Aebischer had osteolysis and concluded that particles of plastic from the prosthetic hip had gotten between the implant and her

bone, wearing away the bone and causing her new hip to loosen. Bonutti told Aebischer that she would need a replacement hip, but she put off surgery, returning several times over the next year and a half for follow-up care. Each time, Bonutti told her that she needed a second hip-replacement surgery.

On June 16, 2003, Bonutti performed a second surgery to replace Aebischer's failing prosthesis and discovered that the "osteolysis and osteolytic lesions were much worse than the radiographs even suggested." After surgery he told Aebischer that her first prosthetic device had exhibited "advanced or catastrophic failure."

Aebischer waited until April 14, 2005—nearly two years after her surgery—to file a lawsuit against Howmedica (the manufacturer of the prosthetic) and Stryker (its parent) asserting various product-liability claims. The defendants removed the suit to the federal district court, which granted summary judgment to the defendants, concluding that Aebischer had filed her suit after the two-year statute of limitations had expired. *See* 735 ILL. COMP. STAT. 5/13-202. In the district court's view, Aebischer was on notice by January of 2002 that her hip problems might have been wrongfully caused. At that point, the court concluded, the two-year statute of limitations began to run, and because Aebischer had waited substantially longer than two years to file suit, her claims were barred. Aebischer appealed.

## II. Discussion

Under Illinois law, which governs this case, lawsuits seeking recovery for personal injury must normally be filed within two years of the injury. 735 ILL. COMP. STAT.

5/13-202. But for injuries that are not readily discoverable, the law makes an exception: the two-year clock begins to run only when the victim (1) discovers her injury and knows that it was wrongfully caused or (2) has "sufficient information concerning [the] injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Daubach v. Honda Motor Co.*, 707 N.E.2d 746, 750 (Ill. App. Ct. 1999).

The district court concluded that Aebischer was on "inquiry notice" that her injury might have been wrongfully caused by at least January of 2002, when her doctor explained that she had osteolysis, that her hip was loosening, and that particles from her prosthesis had gotten between the prosthesis and her bone, wearing it away. Because Aebischer did not file suit within two years of that date, the court concluded that she had sued too late. Aebischer agrees that she was aware of her injury by January of 2002 but claims that she had no reason to suspect that the injury was caused by wrongdoing until June of 2003 (well within the statute of limitations), when Dr. Bonutti told her after her second surgery that her prosthetic device was in a state of "advanced or catastrophic failure."

Usually the date on which a plaintiff receives inquiry notice is a fact question for the jury. *See Kedzierski v. Kedzierski*, 899 F.2d 681, 683 (7th Cir. 1990); *see also Castello v. Kalis*, 816 N.E.2d 782, 788-89 (Ill App. Ct. 2004) ("In most instances, the time at which a plaintiff knows or reasonably should have known both of the injury and that it was wrongfully caused will be a disputed question of fact."). Summary judgment is appropriate only if the jury could draw but one conclusion from the evidence. *See Kedzierski*, 899 F.2d at 683; FED. R. CIV. P. 56. The district

court held that a jury could draw only one conclusion, but we think there was sufficient evidence to allow a jury to side with Aebischer.

Before Aebischer's first surgery, Dr. Bonutti had specifically advised her that she was at increased risk for wear and loosening of her prosthetic hip because she was young, active, and had an unusually small hip socket. Given these warnings, a jury might conclude that Aebischer reasonably attributed her hip problems to her small socket and high activity level and that she initially had no reason to suspect they were wrongfully caused.[1] *See Clark v. Galen Hosp. Ill., Inc.*, 748 N.E.2d 1238, 1243 (Ill. App. Ct. 2001) (when injury is "an aggravation of a physical problem which may naturally develop, absent negligent causes, a plaintiff is not expected to immediately know of either its existence or potential wrongful cause") (internal quotation marks omitted)*; Hochbaum v. Casiano*, 686 N.E.2d 626, 630 (Ill. App. Ct. 1997) (when "the alleged negligent cause of an injury is unknown to the plaintiff at the time the injury is sustained, and another non-negligent cause is apparent, then the limitations period does not begin to run until the alleged negligent cause is discovered")*; see also Aspegren v. Howmedica, Inc.*, 472 N.E.2d 822, 824 (Ill. App. Ct. 1984) (jury might conclude that plaintiff could not have realized her fractured hip implant was defective until after it was removed).

That is not to say a jury will necessarily conclude that Aebischer's failure to suspect wrongdoing was reason-

---

[1] In fact, one of Howmedica's defenses to Aebischer's product-liability claims is just that: Aebischer's activity level and small socket caused excess wear.

able. A reasonable jury might also conclude that Aebischer was on "inquiry notice" of the wrongful cause of her injury in January of 2002. As the district court noted, Aebischer's implant failed after less than 5 years, which was markedly less than the 15 to 20 years Dr. Bonutti had originally predicted, and his prediction attempted to account for her youth and activity level.

The reasonableness analysis may turn on when Dr. Bonutti seriously considered the possibility of a product defect and whether he communicated his suspicions to Aebischer, *cf. Clark*, 748 N.E.2d at 1247 (jury might determine that plaintiff reasonably believed her baby died of nonwrongful causes until being told otherwise by expert), a question that cannot be resolved on the current record. Bonutti testified that prior to the second surgery, he believed Aebischer's rapid wear to be unusual, but the record does not indicate whether he attributed the wear to Aebischer's activity level and socket size or whether he also suspected a product defect before surgery. It is also not clear whether Bonutti's ultimate conclusion about the cause of Aebischer's hip failure was influenced by the large amount of bone damage he found during surgery, which was much worse than he had expected based on presurgery x-rays.

Nor is it clear that Bonutti communicated his suspicions—if he had them—to Aebischer prior to her second surgery. At his deposition Bonutti had difficulty remembering what he had told Aebischer and when. He could not remember whether he had told Aebischer in January of 2002 that her results were abnormal. And he was also unclear about what he told her in April of 2003. When asked whether he had told Aebischer that her results were unusual in April of 2003, Bonutti first said,

"That is correct." Then he interrupted himself and explained that he couldn't "remember specifics." Finally, he sidestepped the question, answering simply, "[T]his was very rapid and unusual in my clinical practice."

Given the evidence in the record, a jury could reasonably decide that Aebischer was not on "inquiry notice" until June 2003 and that she filed suit within the two-year statute of limitations. Summary judgment was therefore inappropriate. We REVERSE the judgment of the district court and REMAND for a trial.