In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-1837

PATRICIA A. STARK,

*Plaintiff-Appellant,*

*v.*

JOHNSON & JOHNSON and ETHICON, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-06609 — **Mary M. Rowland**, *Judge.*

ARGUED NOVEMBER 30, 2020 — DECIDED AUGUST 24, 2021

Before EASTERBROOK, WOOD, and HAMILTON, *Circuit
Judges.*

HAMILTON, *Circuit Judge*. This appeal turns on the Illinois
discovery rule for applying the statute of limitations to prod-
uct liability claims. Plaintiff Patricia Stark had surgery in 2007
to implant a pelvic mesh device. The surgery was not success-
ful, and she had follow-up surgeries that also were not suc-
cessful. In 2018, she learned for the first time that her prob-
lems with the pelvic mesh device might have resulted from a

defect in the product itself. She consulted a lawyer and later that year filed this suit against the manufacturer. The district court concluded that Ms. Stark should have realized much earlier that the product might have been defective. The court granted summary judgment based on the two-year statute of limitations. We reverse.

The statute of limitations began to run only when Ms. Stark should have realized that her mesh-related complications might have been wrongfully caused by another person. As a general rule, the failure of a medical procedure or product to cure a patient does not necessarily signal that anyone acted wrongfully, particularly when the patient experiences known complications that do not necessarily result from tortious actions. In addition here, plaintiff's medical history included Ehlers-Danlos syndrome, which two of her doctors told her could explain her continued problems. The combination of that general principle and plaintiff's specific circumstances could allow a reasonable jury to decide that this suit was timely.

I.  *Factual and Procedural Background*

   A.  *Facts for Purposes of Summary Judgment*

Because plaintiff Stark appeals from a grant of summary judgment, we must view the evidence in the light reasonably most favorable to her and give her the benefit of conflicts in the evidence. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015). We do not vouch for the objective truth of every fact that we must assume to be true for purposes of the appeal. *KDC Foods, Inc. v. Gray, Plant, Mooty, Mooty & Bennett, P.A.*, 763 F.3d 743, 746 (7th Cir. 2014).

1.  *Plaintiff's Relevant Medical History*

In 1999, Ms. Stark began seeing Andrew Roth, M.D., as her primary care physician and obstetrician-gynecologist. During a December 2006 appointment, Dr. Roth diagnosed Ms. Stark with stress urinary incontinence, which is the unintentional loss of urine as a result of an increase in intra-abdominal pressure, such as that caused by coughing or sneezing. Dr. Roth provided Ms. Stark with information about a possible treatment for her incontinence, the surgical implantation of a mesh TVT-Obturator ("TVT-O") sling device manufactured by defendant Ethicon, Inc., a subsidiary of defendant Johnson & Johnson. Dr. Roth testified that, as of his deposition in 2019, he had implanted approximately 400 TVT-O slings.

On February 5, 2007, Ms. Stark returned to Dr. Roth for a consultation about the TVT-O sling. Dr. Roth also offered Ms. Stark a non-surgical treatment option, but she opted for surgery because she wanted a more permanent solution with a higher likelihood of success.

Dr. Roth described the surgery to Ms. Stark in the following terms: "We would make a small incision in the vagina. I would thread a tape [the TVT-O sling] underneath her bladder. It would wrap around the pubic bone and come out the inner thigh on both sides." Dr. Roth testified that they discussed potential risks associated with the procedure, including "death, injury to bowel or bladder, possible nephrostomy, colostomy, exploratory laparotomy, hysterectomy, blood replacement, infection and prolonged catheterization." They did not specifically discuss the risk of mesh from the sling eroding into her urethra. Dr. Roth believed that the potential benefits of the TVT-O sling outweighed the risks in Ms. Stark's case.

Ten days later, on February 15, Dr. Roth performed surgery to implant the TVT-O sling. After the surgery, Ms. Stark had a general feeling that it had not worked. She continued to experience urinary incontinence, leakage, and subsequent odor.[1] After the surgery, Dr. Roth explained to Ms. Stark that her Ehlers-Danlos syndrome ("EDS") might be contributing to her poor wound healing and post-implantation complications. EDS refers to a group of inherited disorders that affect the body's connective tissues. *Ehlers-Danlos syndrome*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/ehlers-danlos-syndrome/symptoms-causes/syc-20362125 (last visited Aug. 23, 2021). People with EDS generally experience symptoms such as hyperflexible joints and extremely stretchy, fragile skin. *Id*. Skin fragility can lead to post-surgical issues, including increased bleeding and poor wound healing.

Dr. Roth did not tell Ms. Stark that mesh from the sling might be the cause of her pain—that the mesh itself might be defective. For her part, Ms. Stark believed then that her EDS was to blame.

In early 2008, Ms. Stark sought a second opinion to address her continued incontinence. On March 5, 2008, Denise Elser, M.D., a urogynecologist, determined that she was still experiencing tenderness in her pelvic floor muscles, stress incontinence, and cystocele. Cystocele, sometimes referred to as a dropped or fallen bladder, occurs when the bladder drops into the vagina. *Cystocele (Fallen Bladder)*, Cleveland Clinic,

---

[1] Dr. Roth testified that urge incontinence can also be a complication of TVT-O sling implantation.

https://my.clevelandclinic.org/health/diseases/15468-cysto-cele-fallen-bladder (last visited Aug. 23, 2021). Dr. Elser also found that Ms. Stark's TVT-O sling had shifted.

Dr. Elser recommended, and Ms. Stark agreed to, implantation of a mesh TVT retropubic sling, also manufactured by Ethicon, to treat her continued incontinence. Both the TVT-O and TVT retropubic slings are made of synthetic mesh. *Midurethral sling surgery for stress incontinence*, Harvard Women's Health Watch (Sep. 2010), https://www.health.harvard.edu/newsletter_article/midurethral-sling-surgery-for-stress-incontinence (last visited Aug. 23, 2021). The retropubic method positions the mesh under the urethra in a U shape. The ends of the sling are brought up behind the pubic bone and out through incisions above the pubic bone. The TVT-O approach passes the mesh under the urethra and out through incisions in the groin.

As part of the informed consent process, Dr. Elser discussed with Ms. Stark the risks of mesh erosion and the need for additional operations to excise any eroded mesh, as well as recurrent stress incontinence, urge incontinence, and voiding difficulty. Dr. Elser scheduled the surgery for May 21, 2008.

During the surgery, Dr. Elser discovered fibers of eroded mesh from the TVT-O sling implanted by Dr. Roth that had become embedded in Ms. Stark's urethral wall. After implanting the new TVT retropubic sling, Dr. Elser removed the eroded mesh and repaired the urethra. However, Dr. Elser was unable to remove all the eroded mesh.

Following the surgery, Dr. Elser explained to Ms. Stark that mesh from the previously implanted TVT-O sling had

eroded into her urethra. Dr. Elser told her that EDS might make her more prone to mesh erosion. At no point did Dr. Elser suggest to Ms. Stark that the mesh from the first sling either was or could be defective.

Ms. Stark next saw Dr. Elser on February 1, 2010. She complained of pelvic pain and increased incontinence. Following an examination, Dr. Elser explained that there was no evidence of stress incontinence, that Ms. Stark was maintaining good bladder volume, and that it appeared that the new sling had accomplished what it was supposed to do. As far as the pelvic pain, Dr. Elser determined that Ms. Stark's fractured coccyx and recent knee surgery might be contributing factors. The two also discussed the possibility of recurrent mesh erosion into the urethra. They planned a cystoscopy for the following month. In a cystoscopy, a physician uses a tube with a camera to examine visually the urethra and the lining of the bladder. *Cystoscopy*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/cystoscopy/about/pac-20393694 (last visited Aug. 23, 2021).

Ms. Stark last saw Dr. Elser on March 11, 2010. She did not see another physician about her incontinence until August 2015. During that five-and-a-half-year gap, Ms. Stark said that her symptoms worsened: the "incontinence was worse than before I had the first [February 2007] surgery, … everything got worse: pain, the flow, the spasms, the leakage, the smell, waking up at night."

On August 19, 2015, Ms. Stark met with Sandra Valaitis, M.D., to discuss her recurrent stress incontinence. While performing a cystoscopy, Dr. Valaitis discovered mesh in Ms. Stark's urethra. In November 2015, Dr. Valaitis attempted to surgically remove what remained of the TVT-O sling—by this

point, only eroded mesh. However, Dr. Valaitis was unable to remove the remnants of mesh from Ms. Stark's urethra.

While Dr. Valaitis declined to offer an opinion about the exact cause of Ms. Stark's continued incontinence and post-procedure complications, she testified that she never said anything to Ms. Stark that would have led her to believe that the mesh—even the eroded mesh—was defective. Also, in her deposition, Dr. Valaitis, like Dr. Roth and Dr. Elser before her, identified EDS as a possible culprit. Ms. Stark "has a known connective tissue disorder, so her connective tissue is much weaker than the average patient, and so that could certainly have played a role."

### 2. *Ms. Stark Retains an Attorney*

In March 2018, Ms. Stark spoke with a friend, Karen Enright, about her two prior TVT sling surgeries and later mesh-related complications. Ms. Enright is a lawyer, and she suggested that Ms. Stark consult with a colleague who specialized in pelvic mesh litigation. Ms. Stark testified that before that conversation, she had had no reason to investigate whether a mesh-related defect was the source of her complications. Ms. Stark had not researched pelvic mesh litigation, discussed such litigation with her husband, or seen any related advertisements. Ms. Stark had believed that her recurrent mesh erosion was "Just my luck, my Ehlers-Danlos." In June 2018, Ms. Stark retained an attorney.

### B. *Procedural Background*

On September 27, 2018, Ms. Stark filed this suit alleging that Ethicon's TVT-O sling was defective and caused her injuries, including but not limited to, continued incontinence, urinary urgency and frequency, erosion damage, bladder

spasms, back pain, severe emotional injury, and loss of enjoyment of life.[2] Defendants moved for summary judgment on the statute of limitations. The district court granted the motion, holding that Ms. Stark needed to file her claims no later than November 2017, two years after the surgery by Dr. Valaitis. *Stark v. Johnson & Johnson*, 2020 WL 1914767, at \*5–\*6 (N.D. Ill. Apr. 20, 2020). This appeal followed.[3]

II.  *Legal Standard: Illinois' Discovery Rule*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We review a grant of summary judgment de novo, construing the record in the light most favorable to Ms. Stark and drawing all reasonable inferences in her favor. *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020).

Ms. Stark's claims under Illinois law are governed by the two-year statute of limitations for personal injury claims in

---

[2] Initially, Ms. Stark alleged defects in both the TVT-O sling implanted in 2007 and the TVT retropubic sling implanted in 2010. She later dropped all claims against the retropubic sling and several claims against the TVT-O sling. The remaining claims against the TVT-O sling allege failure to warn, design defect, and negligent misrepresentation.

[3] Ms. Stark's suit is not part of the 108,000-case multidistrict litigation against seven pelvic-mesh manufacturers, including Ethicon, that was consolidated in the Southern District of West Virginia. That MDL is now closed; no cases remain pending and MDL cases may no longer be filed in that district. See *Multidistrict Litigation*, U.S. District Court, Southern District of West Virginia, https://www.wvsd.uscourts.gov/nodeblock/multidistrict-litigation (last visited Aug. 23, 2021).

735 Ill. Comp. Stat. 5/13–202. In general, under Illinois law, the statute of limitations clock begins to run when facts exist that would authorize the bringing of a cause of action. *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill. App. 3d 6, 14, 845 N.E.2d 22, 30 (2006). Illinois also uses the so-called discovery rule, so that the statute of limitations clock does not start running until the injured party knows or reasonably should have known both that she was injured and that her injury was wrongfully caused by another person. See *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 360–61, 657 N.E.2d 894, 898 (1995). The rule mitigates the harsh consequences that could otherwise result in some cases from mechanical application of the statute. *Id.*; accord, *Hollander v. Brown*, 457 F.3d 688, 692 (7th Cir. 2006).

For this case, the key concept is "wrongfully caused." It "does not mean knowledge of a *specific* defendant's negligent conduct or knowledge of the existence of a cause of action." *Castello v. Kalis*, 352 Ill. App. 3d 736, 744, 816 N.E.2d 782, 789 (2004), quoting *Young v. McKiegue*, 303 Ill. App. 3d 380, 388, 708 N.E.2d 493, 500 (1999). The phrase refers to when the injured party learns that her injury may stem from another's negligence rather than natural causes. *Castello*, 352 Ill. App. 3d at 744–45, 816 N.E.2d at 789. That is enough for the law to expect the injured party to investigate a potential cause of action. *Id.* at 745, 816 N.E.2d at 789.

The Illinois Supreme Court has observed that the time when the injured party knows or should have reasonably known both of her injury and that her injury was wrongfully caused by another person is often a disputed question of fact. *Witherell v. Weimer*, 85 Ill. 2d 146, 156, 421 N.E.2d 869, 874 (1981). When there is a single, clear answer to be drawn from

the undisputed facts in the record, however, the court may determine the issue as a matter of law. *Id.*

III. *Discussion*

The district court concluded that the answer here was sufficiently clear to grant summary judgment. The court determined that, at the latest, Ms. Stark should have known in November 2015 that her mesh-related injuries might have been wrongfully caused. That was when Dr. Valaitis tried but failed to remove remnants of eroded mesh from the TVT-O sling from her urethra. According to the court, the undisputed facts show that by November 2015, Ms. Stark knew or should have known that her injuries were directly related to the eroded mesh.

First, the court found that Ms. Stark was aware of her mesh-related complications shortly after the February 2007 surgery. Immediately after the surgery, she had a general feeling that it did not work. Later, she reported her "failed bladder lift" to Dr. Elser. Second, the court found, Ms. Stark was aware of mesh-related complications immediately after her May 2008 surgery as well, when Dr. Elser informed her of the eroded mesh in her urethra. Third, in February 2010, Dr. Elser again discussed with Ms. Stark the possibility of mesh erosion. Fourth, Ms. Stark testified that between March 2010 and August 2015, her incontinence and pain worsened. Fifth, the court found, Ms. Stark was aware of recurrent complications from eroded mesh in October and November 2015.

The district court determined that Ms. Stark's EDS diagnosis did not raise any genuine issue of material fact. In the court's view, she "still had a duty to investigate whether she had a cause of action and whether her complications were a

result of the surgery, a defective product, or something else entirely."[4] The court continued, "even if Stark's doctors conclusively informed her that her complications arose from her Ehlers-Danlos Syndrome, Stark's claim would still accrue." In other words, whether Ms. Stark believed that EDS was the cause of her complications and whether her doctors told her that EDS could be contributing to her complications had no impact on when Ms. Stark's claims accrued.

We respectfully disagree. The district court's view of the evidence is one reasonable view but not the only reasonable view. Applying the summary judgment standard, we conclude there is a genuine issue of material fact concerning when Ms. Stark reasonably should have known that her mesh-related injuries might have been wrongfully caused.

A jury might reasonably find that Ms. Stark believed that her mesh-related complications were caused by EDS and had no reason to look further for an explanation. In 2007, Dr. Roth specifically discussed with Ms. Stark the possibility of poor wound healing in relation to her EDS. Ms. Stark testified: "It's poor—poor wound healing is the big thing with [Dr. Roth] that he talked about with me." In March 2008, Dr. Elser expressed the same concern, and she and Ms. Stark discussed

---

[4] In support of this point, the court cited *Curtis v. Mentor Worldwide LLC*, 543 F. App'x 901 (11th Cir. 2013). *Curtis* affirmed summary judgment based on the Illinois statute of limitations for a product liability claim against a manufacturer of a transvaginal mesh product, but the decision is not precedential and is readily distinguishable on its facts. Within a year of the surgical implantation, the plaintiff in *Curtis* suffered from an infection and had the mesh product removed by another surgery. She did not have any underlying conditions—such as EDS—that might have led her to reasonably believe that her injury had a natural cause.

whether EDS might make Ms. Stark more prone to mesh erosion. So, although Dr. Roth and Dr. Elser may not have conclusively told Ms. Stark that EDS was responsible for her complications, it is undisputed that they told her that EDS could be contributing to her mesh erosion.[5]

Equally important, none of Ms. Stark's physicians suggested to her that the mesh could be defective. Recall that in 2007, after Ms. Stark's incontinence continued after the surgery, Dr. Roth did not express any concern to Ms. Stark that mesh from the TVT-O sling might be the root of her physical distress. Dr. Elser, too, did not tell Ms. Stark that mesh from the TVT-O sling might be defective or responsible for her complications. In fact, Dr. Elser implanted a *second* mesh sling to treat complications after the first implant. Even Dr. Valaitis never expressed any concern to Ms. Stark that the mesh—even the eroded mesh—might be defective.

It is possible that mesh erosion did not strike Ms. Stark or her physicians as a potential product defect because erosion was a known risk of pelvic mesh implantation. The FDA had approved the use of mesh implants knowing that they are not 100 percent effective. The fact that a known complication or

---

[5] The district court made much of the fact that when asked at her deposition whether any of the doctors told her that EDS was responsible for her mesh-related complications, Ms. Stark replied, "I don't think so." Considered in isolation, however, that statement paints an incomplete picture of her conversations with Dr. Roth and Dr. Elser. After the first (TVT-O) surgery, Dr. Roth thought that Ms. Stark's EDS might make it difficult for her to heal. He expressed this view to Ms. Stark in "multiple" post-surgery telephone calls. After Ms. Stark continued to experience urinary incontinence after the TVT retropubic implant, Dr. Elser told her that the new sling was effective.

failure occurs could reasonably be interpreted as a sign that such product or procedure-related failures could occur without anyone acting wrongfully. See, e.g., *Eghnayem v. Boston Scientific Corp.*, 873 F.3d 1304, 1324 (11th Cir. 2017) (affirming plaintiff's verdict in mesh product liability case under Florida law; jury "could have reasonably concluded that Eghnayem's injury was not so 'distinct … from conditions naturally to be expected from [her post-surgical] condition,' and so the timeliness of Eghnayem's action was properly a question of fact for the jury") (quotation omitted); *In re Mentor Corp. Obtape Transobturator Sling Prods. Liability Litig.*, 748 F. App'x 212, 216–17 (11th Cir. 2018) (applying *Eghnayem*, holding that material fact dispute precluded summary judgment on statute of limitations defense where plaintiff experienced symptoms that "were acknowledged side effects of ObTape implants, mesh implants generally, and mesh implant surgery"); see also *Gutierrez v. Ethicon, Inc.*, — F. Supp. 3d —, 2021 WL 2431016, at *2, *9–*11 (W.D. Tex. Apr. 23, 2021) (defendants not entitled to judgment as a matter of law on Texas statute of limitations where doctor told plaintiff that "extruding" portions of TVT-O mesh in plaintiff's vagina were "known complication").

Ultimately, then, a jury could reasonably infer that Ms. Stark actually discovered the potentially wrongful cause of her injuries less than two years before filing suit, when she first discussed pelvic mesh litigation with her friend, Ms. Enright, in March 2018, and that she did not have sufficient reason to suspect that wrongful cause any earlier.

A jury might also reasonably conclude, however, that after two TVT implants, two mesh removal surgeries, three doctors, and, through it all, unabated incontinence, pain, and

associated side effects, Ms. Stark's theory that her EDS was the source of her complications became increasingly unreasonable. Ms. Stark herself testified that from her last visit with Dr. Elser in March 2010, until seeing Dr. Valaitis in August 2015, her "incontinence was worse than before I had the first surgery, and I felt like everything got worse: pain, the flow, the spasms, the leakage, the smell, waking up at night." The different but reasonable inferences from Ms. Stark's medical history pose a genuine dispute of material fact as to when she should have known that her injury might have been wrongfully caused.

Several cases support our conclusion that summary judgment was not proper. In *Aebischer v. Stryker Corp.*, 535 F.3d 732 (7th Cir. 2008), we applied Illinois' discovery rule to reverse a grant of summary judgment. We found a genuine dispute of material fact as to whether the plaintiff's failure to suspect wrongdoing was reasonable in light of her doctor's advice, following her first hip replacement surgery, that she was naturally at increased risk of injury. *Id.* at 734. The plaintiff's doctor "advised her that she was at increased risk for wear and loosening of her prosthetic hip because she was young, active, and had an unusually small hip socket." *Id.* The plaintiff required a second hip replacement surgery less than five years later. Although her doctor testified that he believed such rapid failure to be "unusual," he could not remember when he expressed his suspicions about the implant itself to the plaintiff. *Id.* at 735. The record did not indicate whether he had seriously considered the possibility that the prosthetic hip was defective. The jury could therefore reasonably side with the plaintiff and find that she was not on inquiry notice until after her second surgery, when her doctor told her that the

first device had exhibited "advanced or catastrophic failure." *Id.* at 733–34.

In *Hochbaum v. Casiano*, 292 Ill. App. 3d 589, 686 N.E.2d 626 (1997), the Illinois Appellate Court clarified how trial courts should treat the interplay between negligent and non-negligent causes of injuries:

> Where a traumatic injury is sustained in the absence of an apparent non-negligent cause, it is fair to place a burden on the injured party to inquire as to the actual cause. On the other hand, in the case of an injury that appears to have been caused by some non-negligent event, such as an illness, and the actual cause is unknown, the injured party has no reason to conduct such an inquiry and to require him or her to do so would be patently unfair.

*Id.* at 595, 686 N.E.2d at 630; see also *id.* at 595–96, 686 N.E.2d at 630–31 (reversing summary judgment in part; material fact dispute existed as to whether plaintiff believed her suicide attempt had been caused by depression and did not learn of possible effects of Prozac until 18 months later).

Four years later, in *Clark v. Galen Hospital Illinois, Inc.*, 322 Ill. App. 3d 64, 748 N.E.2d 1238 (2001), the court reaffirmed this principle, explaining that when the injury at issue is an "aggravation of a physical problem which may naturally develop, absent negligent causes," a plaintiff is not immediately expected to suspect wrongful causation. *Id.* at 70, 748 N.E.2d at 1243, quoting *Saunders v. Klungboonkrong*, 150 Ill. App. 3d 56, 60, 501 N.E.2d 882, 885 (1986). In *Clark*, the plaintiff filed a medical negligence suit against hospital defendants for the

wrongful death of her premature infant son, who allegedly died as a result of sepsis caused by a dislodged venous catheter. 322 Ill. App. 3d at 65–66, 748 N.E.2d at 1240. The plaintiff argued that the trial court erred by finding that the death of her son constituted a traumatic injury that started the statutory clock. *Id.* at 66, 748 N.E.2d at 1240. According to the plaintiff, the statute of limitations began to run nineteen months later, when she received an expert's report that the death was caused by the dislodged catheter. *Id.*

The appellate court reversed, finding a factual dispute as to when plaintiff should have known or suspected negligent medical treatment by defendants so as to start the statutory clock. *Id.* at 75, 748 N.E.2d at 1247. The court emphasized the infant's "extreme prematurity" at the time of his death. *Id.* (He was born at 23 weeks.) The plaintiff alleged that she was told her son died from complications associated with prematurity, infection and low birth weight, and blood clotting and transfusions. *Id.* at 74, 748 N.E.2d at 1247. The appellate court explained that it was reasonable for plaintiff to believe that the death was due to non-negligent causes. The court also emphasized that it would be "manifestly unrealistic and unfair to bar a negligently injured party's cause of action before he has had an opportunity to discover that it exists." *Id.* at 70, 748 N.E.2d at 1243, quoting *Kristina v. St. James Hosp.*, 63 Ill. App. 3d 810, 813, 380 N.E.2d 816, 819 (1978).

The circumstances before us are remarkably similar. And the reasoning of these cases under Illinois law echoes the above-cited cases under Florida and Texas law finding that erosion of pelvic mesh did not necessarily start the statutory clock in *Eghnayem*, *In re Mentor Obtape*, and *Gutierrez*. We therefore think the Illinois courts would not bar Ms. Stark

from bringing her claims because she did not have the insight or suspicion to investigate the manufacturer of the TVT-O sling while she reasonably believed that her continuing problems were the result of natural causes, including, most notably, her own EDS. Barring her claims would be both "unrealistic and unfair." See *Clark*, 322 Ill. App. 3d at 70, 748 N.E.2d at 1243.

The three cases cited by the district court as compelling summary judgment for defendants, *Witherell v. Weimer*, 85 Ill. 2d 146, 421 N.E.2d 869 (1981), *Hoffman v. Orthopedic Systems, Inc.*, 327 Ill. App. 3d 1004, 765 N.E.2d 116 (2002), and *Orso v. Bayer Corp.*, 2009 WL 249235 (N.D. Ill. Feb. 2, 2009), are readily distinguishable from this case. We begin with *Orso* and *Hoffman* because they are more easily distinguishable and conclude with a detailed discussion of the Illinois Supreme Court's decision in *Witherell*.

In *Orso*, the plaintiff filed suit against Bayer in January 2004, alleging that its nasal decongestant drops were the cause of her dependency on the drops and/or her ongoing and exacerbated ("rebound") congestion. 2009 WL 249235, at *2. Plaintiff testified that she was unaware that the drops themselves could have been to blame until her husband's chance encounter with a man who was similarly addicted to the drops and had filed suit against Bayer. *Id.* at *4. The district court concluded that plaintiff's suit was time-barred because the record showed that, as early as 1991 and no later than September 2000, plaintiff knew that she had rebound congestion, was dependent on the drops for relief, and had been diagnosed with a "likely addiction" to the drops. *Id.* at *1, *4. In both 1991 and 2000, the court emphasized, plaintiff had been advised to discontinue use of the drops and had

even been prescribed other medication as a substitute. *Id.* at *1.

The facts here are quite different. Although Ms. Stark was told that the mesh was eroding, she was never told that the mesh was or even might be defective. Quite the opposite. Dr. Elser implanted a second mesh sling to correct matters after the first one appeared to be eroding.

In *Hoffman*, following an accident on a city-owned bus, plaintiff was scheduled for a "fairly simple" spinal surgery in September 1995. 327 Ill. App. 3d at 1006, 765 N.E.2d at 118–19. When she woke after the surgery, she was in the intensive care unit. *Id.*, 765 N.E.2d at 119. During the surgery, she had contracted hepatitis, and after the surgery she had liver failure, kidney failure, gastrointestinal bleeding, pneumonia, a heart arrhythmia, and septicemia. *Id.*, 765 N.E.2d at 119. She was told that "everything that could go wrong went wrong." *Id.* Before the surgery, plaintiff had retained a law firm to handle her claim against the city. *Id.* at 1007, 765 N.E.2d at 119. Four to six months after her surgery, plaintiff asked the firm to investigate possible medical malpractice during the surgery. *Id.* The inquiry never materialized further than her initial request. *Id.* at 1010–11, 765 N.E.2d at 122.

A few years later, that plaintiff learned that the hospital's internal investigation of her 1995 surgery had determined that the surgical table caused her injuries. *Id.* at 1007–08, 765 N.E.2d at 119–20. Plaintiff filed suit against the table manufacturer in May 1998. The appellate court affirmed summary judgment for the manufacturer. The "more obvious the injury," the court reasoned, "the more easily a plaintiff should be able to determine its cause." *Id.* at 1009, 765 N.E.2d at 121. And, in any event, the court concluded, at the point that

plaintiff directed her attorney to investigate possible medical malpractice, she was indisputably on inquiry notice. *Id.* at 1010, 765 N.E.2d at 122.

*Hoffman* differs from the case before us for two reasons. First, in Ms. Stark's case, there was no obvious, triggering event. In *Hoffman*, following her surgery, plaintiff was told by two doctors that "everything that could go wrong went wrong." *Id.* at 1006, 765 N.E.2d at 119. That was an understatement. The plaintiff went in for spinal surgery and woke up with hepatitis and multiple organ failure. Here, we have no similar singular event that indisputably should have put Ms. Stark on inquiry notice. Also, Ms. Stark did not retain a lawyer until she had a conversation with her friend about pelvic mesh litigation. We have no direct indication that Ms. Stark believed earlier that she had been injured by anyone's wrongful conduct.

*Witherell* also presented quite different facts as to the plaintiff's knowledge of a possible product defect. That plaintiff filed suit against her doctors, Dr. Weimer and Dr. Taubert, and a pharmaceutical corporation ("Ortho"), alleging that her leg injuries were caused by birth-control pills manufactured by Ortho and prescribed by the doctors. 85 Ill. 2d at 148–49, 421 N.E.2d at 870–71. Dr. Weimer first prescribed the pills to plaintiff in 1966. Soon after, plaintiff began to have pain and spasms in her left leg, which eventually became swollen to the point that the leg was unusable. *Id.* at 149, 421 N.E.2d at 871. She finally consulted Dr. Weimer about the pain in March 1967. He advised that she had a muscle condition and would have to learn to live with the discomfort. Dr. Taubert, on the other hand, felt she might have a blood clot in her leg and

decided to hospitalize her. Nevertheless, the plaintiff continued to take the pills.

In 1972, plaintiff was hospitalized again. When she said that she had heard from other women that birth-control pills could cause blood clots, Dr. Weimer laughed her off. Dr. Taubert, however, told plaintiff that she was having blood clots. *Id.* at 156–57, 421 N.E.2d at 874. In 1973, plaintiff discontinued use of the pills for one month but resumed use at the behest of Dr. Weimer. *Id.* at 149, 421 N.E.2d at 871.

In May 1976, nearly ten years after she began taking the birth-control pills, plaintiff was hospitalized for a third time. *Id.* at 150, 421 N.E.2d at 871. Once again, Dr. Weimer told her it was her muscle condition and denied her request to perform a venogram to determine if she had lingering blood clots. At that point, plaintiff decided to consult a third doctor, who admitted her to another hospital, performed a venogram, and determined that she had thrombophlebitis and that some of the veins in her leg were occluded by old clots. *Id.* at 150–51, 421 N.E.2d at 871–72. Plaintiff filed suit against Dr. Weimer, Dr. Taubert, and Ortho in January 1978. *Id.* at 148, 421 N.E.2d at 870.

While the Supreme Court of Illinois concluded that the plaintiff could proceed against the doctors, her claims against Ortho were time-barred. *Id.* at 157–58, 421 N.E.2d at 875. Given the severe difficulties experienced by plaintiff for over ten years, her personal knowledge that birth-control pills could cause blood clots, and her 1967 and 1972 diagnoses with blood clots in her legs, the court found it "inconceivable" that a reasonable person would not have realized, at least by the time of her second hospitalization in 1972, that she might not have been receiving proper treatment. *Id.* at 156–57, 421

N.E.2d at 874. And, regarding Dr. Weimer's insistence that a muscle condition—rather than the pills—bore responsibility for plaintiff's leg issues, the court explained that Ortho should not be penalized because of the doctor's error. *Id.* at 157, 421 N.E.2d at 875.

Here, defendants try to make the same argument, that it is "inconceivable" that a reasonable person in Ms. Stark's position would not have realized by November 2015 that she needed to investigate possible product defects. By then she had undergone two mesh removal procedures, and her mesh-related symptoms—including incontinence—continued to worsen after the first revision surgery in May 2008. Further, defendants reason, both Dr. Elser and Dr. Valaitis discussed with Ms. Stark the risk of mesh erosion, so she knew that erosion was a possible outcome. But this reasoning does not resolve the case, and certainly not on summary judgment. The fact that erosion was a known complication could reasonably be taken to mean that erosion could occur without the product being defective, especially when Dr. Roth and Dr. Elser told Ms. Stark that EDS might make her more prone to mesh erosion.

In *Witherell*, plaintiff continued to see the same two doctors for ten years—despite two hospitalizations and multiple clues that her birth-control pills might be causing severe and debilitating issues in her leg. 85 Ill. 2d at 149–50, 421 N.E.2d at 871. In fact, Dr. Taubert had specifically diagnosed her with blood clots in the leg. *Id.* at 156–57, 421 N.E.2d at 874. So, in 1976, when plaintiff finally saw a third doctor, her thrombophlebitis diagnosis, that she had clotting in her superficial veins, was not substantial, new information.

*Id.* at 150–51, 421 N.E.2d at 871–72. It was more information of the kind she already had.

For Ms. Stark, the conversation with Ms. Enright was apparently the first time she was alerted to even the possibility that the mesh itself—rather than her EDS or unexplained natural causes—might be causing the complications and continued symptoms. None of Ms. Stark's doctors ever suggested to her that the mesh might be defective. In fact, as defendants point out, Ms. Stark was twice warned that mesh erosion was a known risk of the TVT-O sling, but that information can be fairly interpreted as signaling that mesh erosion can happen without anyone having acted wrongfully. When Ms. Stark reasonably knew or should have known that her mesh-related complications might have been caused wrongfully is not self-evident. That lack of a single, clear answer is precisely why the statute of limitations questions here cannot be resolved on summary judgment. See *Witherell*, 85 Ill. 2d at 156, 421 N.E.2d at 874.[6]

---

[6] Several statute of limitations cases from the pelvic mesh MDL are also instructive on this point. In *Sanchez v. Boston Scientific Corp.*, 2014 WL 202787 (S.D. W. Va. Jan. 17, 2014), the district court denied Boston Scientific's motion for summary judgment on timeliness grounds. Despite four revision surgeries to correct issues with the mesh sling, the plaintiff's physician continued to tell her that her body had a "propensity" to expel mesh and that "'for some reason [Ms. Sanchez's] body did not like' the mesh products." *Id.* at *2. Plaintiff's physician further testified that she had never attributed plaintiff's symptoms to a defect in the mesh. *Id.* So, the court reasoned, given her physician's statements, a jury might conclude that plaintiff reasonably believed her mesh-related injuries were caused by her body's natural reaction to the mesh. *Id.* at *8. On the other hand, after four revision surgeries, several medical treatments, and nineteen

medical appointments, a jury might also conclude that plaintiff's continued belief in the "natural reaction" theory had become unreasonable. *Id.*

In *Long v. Ethicon, Inc.*, 2020 WL 5740258 (D. Or. Sep. 11, 2020), the magistrate judge also recommended denying Ethicon's motion for summary judgment on timeliness grounds, emphasizing the fact-intensive nature of the inquiry:

> Whether [plaintiff] should have been aware of the substantial possibility that the TVT product was the cause of her ongoing injuries rather than other causes in her surgical history or health conditions, and whether [plaintiff] was subject to a duty to inquire about facts that may trigger the statute of limitations, are themselves genuine issues of material fact.

*Id.* at *5 (citation omitted). In other words, parsing the finer points of plaintiff's health and medical history was an issue for trial, not summary judgment.

By contrast, in *Cutter v. Ethicon, Inc.*, 2020 WL 109809, at *6 (E.D. Ky. Jan. 9, 2020), the district court granted summary judgment on statute of limitations grounds, holding that plaintiff's claim accrued no later than March 2011. Plaintiff received her initial mesh implant in June 2006. *Id.* at *2. She continued to report pain, leakage, burning, and constipation in follow-up appointments. In October 2008, her doctor discovered that the right arm of the mesh device had "come loose." The doctor informed plaintiff of the issue and performed a revision surgery in December 2008 to remove part of the mesh. Plaintiff's pain continued unabated, but she failed to inform a physician until August 2010. In September 2010, a second doctor performed a second revision surgery to remove a *second* portion of the mesh that had "rolled up."

In December 2010, plaintiff informed the second doctor that her husband had felt a "sharp scrape" during intercourse. *Id.* In March 2011, the second doctor recommended surgery to remove the mesh. In March 2012, a third doctor performed a third revision surgery. In the meantime, in November 2011, Plaintiff and her husband saw an attorney advertisement involving the initial mesh implant. Plaintiff filed suit in May 2012. The district court reasoned that by March 2011, plaintiff had sufficient

We must also consider the specifics of Ms. Stark's medical history against the backdrop of a more general principle. Ms. Stark—like all other patients—should not be penalized for trusting her physicians' advice and not suspecting too quickly that her poor medical outcome was caused by a negligent actor.

Medical treatment of human disease can be complex and full of uncertainty. Success is not guaranteed, and a surgery's "failure" or shortcomings should not necessarily be sufficient to tell a patient that she should start investigating possible claims against her physicians or the manufacturers of the products they used. Although we have made this point repeatedly in medical malpractice cases, it applies with equal force to product liability claims, where patients often confront similar circumstances: faced with some illness or injury, a patient seeks counsel from a trusted physician, follows the

---

knowledge of "critical facts" that would start the one-year statutory clock because: (i) she required three revision surgeries; (ii) problems persisted even after the second revision surgery to the point that her husband felt a "scrape" during intercourse; and (iii) as early as 2008, plaintiff knew that the mesh was not working as it should be, even if she had not been told affirmatively that the mesh was defective. 2020 WL 109809 at *6.

*Sanchez*, *Long*, and *Cutter* show that the statute of limitations in pelvic mesh implant cases can turn on fact-intensive inquiries concerning: (i) the plaintiff's own, frequently complex, medical history, including past surgeries, treatments, and diagnoses; (ii) the product itself—how it was implanted, how many revision surgeries were required, whether it was fully or partially removed; and (iii) the revolving door of physicians—one, two, maybe even three or four treating physicians—and what they did and did not tell plaintiff. These are just a few of the questions that may need to be resolved to determine whether a pelvic mesh plaintiff's case is time-barred.

physician's suggested course of treatment, and then experiences an unfortunate outcome.

That unfortunate outcome, by itself, is not sufficient to start the statute of limitations clock. See *P.W. by Woodson v. United States*, 990 F.3d 515, 521 (7th Cir. 2021); *id.* at 527 (Hamilton, J., dissenting) (a "poor medical outcome alone" is insufficient to start the statute of limitations clock); see also *E.Y. ex rel. Wallace v. United States*, 758 F.3d 861, 867 (7th Cir. 2014) ("In applying the FTCA statute of limitations to claims of medical malpractice, we have long avoided requiring would-be plaintiffs to engage in paranoid investigations of everyone who has ever provided them with medical care.") (citations omitted); *Arroyo v. United States*, 656 F.3d 663, 677 (7th Cir. 2011) (Posner, J., concurring) (patients should be held to the level of information they are actually given: "Had someone informed the Arroyos that it was 'highly possible' that the injuries to their child had been caused by the failure to administer antibiotics to Mrs. Arroyo, the statute of limitations would have begun to run then…."); *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985) (rejecting rule that would have the "ghoulish consequence" of requiring patients with poor or imperfect outcomes to inspect hospital records immediately for signs of physician error); *Nemmers v. United States*, 795 F.2d 628, 631 (7th Cir. 1986) (citing *Drazan*: "the statute of limitations should not be construed to compel everyone who knows of an injury to scour his medical records just in case the government's physician did something wrong"). There must be some other circumstances present that would prompt a reasonable person—meaning, a reasonable patient, not, we emphasize, a reasonable doctor or a reasonable lawyer—to suspect or investigate a potential wrongful cause. In this case,

the evidence does not show beyond reasonable dispute that any such "other" circumstances were present.

We have said that when "knowing a fact depends on having technical knowledge, the incredible variance in such knowledge across American society can make the knowledge of the average person a perverse benchmark." *Arroyo*, 656 F.3d at 675 (Posner, J., concurring). It follows, then, that a reasonable doctor in Ms. Stark's position might be held to a different standard. But Ms. Stark is not a doctor. So it makes little sense to hold her to a standard of information or to charge her with a level of technical knowledge that eluded even her doctors. Dr. Roth did not tell Ms. Stark that the mesh from the first sling might be the cause of her pain. Dr. Elser, while she discussed the possibility of mesh erosion into Ms. Stark's urethra, did not suggest to Ms. Stark that the mesh from the first sling might be defective. In fact, both doctors told Ms. Stark that her EDS might make her more prone to mesh erosion. Dr. Valaitis, too, never said anything to Ms. Stark that would lead her to believe that even the eroded mesh was defective. And, while it is unclear whether Dr. Valaitis told Ms. Stark that her EDS could have contributed to her continued incontinence and post-procedure complications, Dr. Valaitis testified that Ms. Stark "has a known connective tissue disorder … so that could certainly have played a role."

Put simply, all three doctors who treated Ms. Stark during this period failed to suggest to her that the mesh device could be the source of her complications.[7] And all three doctors,

---

[7] In this way, again, we emphasize that Ms. Stark's case is distinct from *Witherell*, where plaintiff's first two doctors came to two very different conclusions. Dr. Weimer told plaintiff that a muscle condition, not her birth-control pills, was to blame for her swollen, unusable left leg. 85 Ill.

whether in conversations with Ms. Stark or in testimony, actually said that her EDS could be to blame. A jury could find that Ms. Stark was therefore objectively reasonable in continuing to believe, until her conversation with Ms. Enright, that her EDS was to blame, and in not looking for any further explanation. To find otherwise, at least as a matter of law, would produce the "harsh" result that the Illinois discovery rule was intended to mitigate. E.g., *Hollander*, 457 F.3d at 692; *Golla*, 167 Ill. 2d at 360–61, 657 N.E.2d at 898.

Finally, while we acknowledge the district court's point, drawn from Illinois caselaw, that the more obvious the injury, the more easily a plaintiff should be able to determine its cause, we do not think that Ms. Stark's condition was so obviously a *wrongful* injury. See *Hoffman*, 327 Ill. App. 3d at 1009, 765 N.E.2d at 121. That is, before she spoke with Ms. Enright, Ms. Stark could reasonably believe that her mesh-related complications were brought on by her body's natural reaction to the mesh—that her pre-existing EDS was to blame, and she need not look any further for a *reasonable* explanation—particularly where, as here, her "natural reaction" theory was substantiated in conversations with Dr. Roth and Dr. Elser. Additionally, Ms. Stark could reasonably

2d at 149, 421 N.E.2d at 871. Dr. Taubert, on the other hand, felt that plaintiff might have a blood clot in her leg and decided to hospitalize her. *Id.* When plaintiff was hospitalized a second time, Dr. Weimer and Dr. Taubert again came to different conclusions about the potential for birth-control pills to cause blood clots. *Id.* at 156–57, 421 N.E.2d at 874.

That's not what happened here. Ms. Stark's three doctors shared an identity of opinion regarding her condition that was plainly absent in *Witherell.* Her doctors never opined *to her* that the mesh was possibly defective, and, at some point, all three opined that her EDS was possibly to blame for her continued incontinence and post-procedure complications.

believe that the mesh device was not defective or the source of her complications because Dr. Elser implanted a second mesh device to treat issues either caused or exacerbated by the first mesh device. These theories are reasonably aligned: Ms. Stark believed that her body rejected the first mesh device, but believed that the second device, as Dr. Elser told her, was working as it was supposed to.

Then again, as defendants argue, perhaps Ms. Stark was unreasonable in holding onto this "natural reaction" theory for so long. On the record before us, it is simply not clear. And where there is reasonable doubt, summary judgment is not appropriate. The choice between competing reasonable inferences is for a jury.

REVERSED AND REMANDED for proceedings consistent with this opinion.