[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13218

_____

VIRGINIA REDDING

Plaintiff-Appellee,

*versus*

COLOPLAST CORP,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:19-cv-01857-CEM-DAB

_____

Before BRANCH, LUCK, and TJOFLAT, Circuit Judges.

BRANCH, Circuit Judge:

This appeal is about when Florida's statute of limitations begins to run in vaginal mesh products liability cases. On September 18, 2014, Virginia Redding sued Coloplast Corporation, alleging that vaginal mesh devices inserted inside her body were defectively designed.[1] The parties went to trial on April 14, 2022. Coloplast argued at various points throughout trial—including, most relevant here, in a renewed motion for judgment as a matter of law—that Redding's suit was time barred under Florida's four-year statute of limitations for products liability lawsuits because her claim accrued more than four years before she filed suit. The district court sided with Redding, and Coloplast appeals.

After careful review and with the benefit of oral argument, we discern no error in the district court's decision. Accordingly, we affirm the district court's denial of Coloplast's renewed motion for judgment as a matter of law.

## I.    Background

While using the restroom one day in 2008, Redding felt something like a heavy "bulge" "coming out" of her. She started experiencing bladder issues, like urine leakage, and in 2009, the pain became "unbearable." She visited Dr. Robert Weaver, a urologist and pelvic floor surgeon, who explained her treatment

---

[1] We note that both Coloplast and the district court occasionally erroneously refer to Redding's suit as being filed on September 28, 2014. However, the record confirms that it was in fact filed on September 18, 2014.

options: either a surgery to implant two Coloplast synthetic vaginal mesh devices[2] or a hysterectomy. Redding chose to surgically implant the mesh devices.

Redding and Dr. Weaver discussed the risks of the mesh devices, including infection and mesh erosion. A mesh erosion occurs when "the mesh destroys the tissue either of the vagina . . . or it does the same to the tissue of the bladder or the urethra." Dr. Weaver also relayed that a risk of infection accompanies any surgery. Redding chose to move forward with the mesh implantation because she "wanted to have . . . much more of a comfortable life[.]"

On December 15, 2009, Dr. Weaver surgically implanted the two Coloplast synthetic mesh devices in Redding. Dr. Weaver testified that there were no complications during the surgery. Three days after the surgery, Dr. Weaver wrote "no problems" in his medical notes.

Over the next six months, from December 2009 to May 2010, Redding saw Dr. Weaver five times for follow-up appointments. According to Redding, Dr. Weaver never communicated to her that the mesh placed inside her body was defective or unsafe. Several of Dr. Weaver's notes from these appointments mention a "tiny erosion" he found near the surgical

---

[2] The first device, a NovaSilk mesh, aimed to treat Redding's anterior pelvic prolapse. The second device, a Supris sling, was intended to treat Redding's stress urinary incontinence.

site.  Dr. Weaver put the size of this "tiny erosion" in perspective by providing the following testimony at trial: "People that come in with big problems, come in with these big erosions that are several centimeters in size.  This [tiny erosion] is something that's like a millimeter wide that probably would heal on its own."  Dr. Weaver also testified that this tiny erosion "never changed" throughout his appointments with Redding and "was never bothering anything." He reiterated that the tiny erosion "was causing no problem[s]." Accordingly, Dr. Weaver left the tiny erosion alone.

Dr. Lennox Hoyte, an expert witness for Redding, agreed with Dr. Weaver's decision not to treat the post-operative erosion because such tiny erosions often "resolve on their own over time." Dr. Hoyte testified that Dr. Weaver's notes show no indication that Redding's erosion grew.  He also stated that Redding's small erosion, which he called a "postsurgical complication," eventually resolved after she stopped being treated by Dr. Weaver.

Redding stopped seeing Dr. Weaver in May 2010.  In 2014, she sought treatment from Dr. Steven McCarus, a gynecologic surgeon, for a larger mesh erosion in a different location.

Because, as we explain below, Redding's knowledge of her injury is key to the inquiry of whether her suit is time barred, we discuss Redding's five postoperative visits with Dr. Weaver, which spanned from December 2009 to May 2010, chronologically and in detail.  We then discuss her 2010 to 2014 care, including her 2014 surgical intervention.

### 1.    December 28, 2009

Redding visited Dr. Weaver for a follow-up appointment 13 days after surgery, on December 28, 2009.  Dr. Weaver, relying on his medical notes,[3] testified that Redding had a tiny erosion that was "asymptomatic," meaning "[i]t wasn't causing any problem at the time."  He observed that Redding "had no urinary incontinence, no leakage" and the mesh products "would have been working well." He noted there were no reports of pain, and he testified that he would have recorded pain if Redding had mentioned it.  Nevertheless, Redding was experiencing some drainage, discharge, and odor, so he gave her an antibiotic cream for a possible vaginal infection.  He testified that he "wasn't really focused on the graft as the cause" of any infection.  Additionally, he gave Redding an estrogen cream to help the tiny erosion.  In short, Dr. Weaver testified that "it looked like the surgery overall had been a success other than [the] tiny area where the wound had opened up."  Dr. Weaver explained that he did not relay to Redding that he believed there were any problems with the mesh devices because the "tiny area would probably heal over if we gave it a chance, to leave it alone.  [It was] very early."

Redding testified during trial that, around the time of this follow-up appointment, she was experiencing problems with her

---

[3] Dr. Weaver testified he had no "independent memory of treating Ms. Redding" 13 years earlier and relied on his medical notes in providing his testimony.

bladder.[4]  She described an odor and "sharp pain that [ran] down into . . . [the] bottom of [her] stomach" that made "the vagina area ache[] like a toothache."  According to Redding, Dr. Weaver told her that she had a mesh erosion and an infection.  When asked if she thought then that the Coloplast products implanted in her body were "unsafe," she answered: "I thought something was wrong with it, that something was just not—I don't know.  Something was wrong and I—I don't know."

### 2.    January 13, 2010

On January 13, 2010, Redding visited Dr. Weaver again.  Dr. Weaver wrote two phrases in his medical notes that day: "good support," and "tiny erosion."  He testified that there was no "change . . . in the graft exposure or tiny erosion" and that the erosion remained asymptomatic.  According to his notes, Redding made no complaints of pain or odors.  In fact, Redding seemed to be improving because the drainage was "going away."  When asked about this appointment at trial, however, Redding testified that "something was wrong[.]"

### 3.    February 10, 2010

Redding saw Dr. Weaver again on February 10, 2010.  Dr. Weaver testified: "She was voiding fine, no vaginal discharge."  The

---

[4] Redding testified that she does not "recall the details or dates of every visit [she had] with every physician," and therefore medical records would be "a more accurate way to discern some of [the] information" regarding her post-surgical problems.

record shows no complaints about discharge, odor, or pain, and no issues with the bladder. Dr. Weaver explained that at the time, Redding "had a subjective feeling that she may not be emptying [her bladder] completely," but that subjective feeling was not connected to the tiny erosion. He remained under the impression that the surgery was a success. Redding testified that, during this visit, she still had an erosion.

### 4.    March 18, 2010

Redding visited Dr. Weaver again on March 18, 2010. Dr. Weaver testified that the erosion remained asymptomatic, and Redding had no infections.

Redding testified that she still had the tiny erosion during this appointment and that she also experienced additional problems: the bulge was returning, and she had discomfort while standing. She thought "[her] body might be rejecting some things." Dr. Weaver responded that Redding's discomfort while standing was distinct from severe vaginal pain.

### 5.    May 10, 2010

Redding's fifth and final appointment with Dr. Weaver took place on May 10, 2010. Dr. Weaver's medical notes for this visit show that Redding reported, "I am doing well." The medical record also says "[n]o abnormalities," meaning Dr. Weaver "didn't see anything else wrong." Dr. Weaver testified that any trouble emptying the bladder was unrelated to the tiny erosion.

Redding testified that, during this visit, she still had the tiny erosion. She also said that she continued to have difficulty standing, she had trouble emptying her bladder, she had an infection, and a "smell was still bothering [her]."

### 6.    May 2010-May 2014

Redding stopped seeing Dr. Weaver after her May 2010 appointment. When asked, "would you have stopped seeing Dr. Weaver if you were still having problems?" Redding answered "[n]o." But Redding testified during trial that, between 2010 and 2014, she experienced the "same [complaints] as before"—"[t]he sharp and chronic pains in the bottom of [her] stomach and the drainage."

Four years later, around May 2014, Redding met with her primary care physician and her gynecologist about vaginal bleeding (including postmenopausal bleeding) and pelvic pain—symptoms about which, according to the record, she had not yet complained. Her doctors referred her to Dr. McCarus, a gynecologic surgeon.

### 7.    June-July 2014 Care

Redding saw Dr. McCarus on June 12, 2014. Dr. McCarus determined that Redding's pelvic pain related to the Coloplast mesh, which he diagnosed as eroding inside her. He described the size of Redding's erosion at the time as "approximately a

22-11270                Opinion of the Court                9

centimeter."[5]   Dr. Hoyte noted that "the source of [Redding's] bleeding [in 2014 was] a different location than . . . that tiny erosion that was described by Dr. Weaver in 2010."   He testified that erosions may show up years after mesh is implanted—which, in his opinion, occurred here.

Dr. McCarus performed two mesh removal surgeries: one on June 17, 2014, and another on July 22, 2014.  The second surgery involved a hysterectomy.  Since the 2014 surgeries, Redding's pain and bladder problems have not improved.

Shortly after these two surgeries, on September 18, 2014, Redding sued Coloplast, claiming, as relevant here, that the products placed inside her were defectively designed and manufactured.[6]  Coloplast moved for summary judgment, arguing in part that Redding's suit was time barred under Florida's four-year statute of limitations because her cause of action accrued before September 18, 2010 (*i.e.*, more than four years prior to her filing suit).  Coloplast relied on deposition testimony and medical records from Redding's 2009 and 2010 visits with Dr. Weaver to argue that "by at least December 28, 2009, . . . Redding was aware

---

[5] The 2014 erosion was larger than the tiny erosion observed by Dr. Weaver, which he had described as only "a millimeter wide."

[6] Redding first sued as part of a mesh multidistrict litigation lawsuit against Coloplast in the Southern District of West Virginia.  In total, she raised 16 claims, including counts of design defect, manufacturing defect, defective product, negligence, failure to warn, and fraud.  The Southern District of West Virginia transferred her case to the Middle District of Florida on September 27, 2019.

of her injuries, and thus, the facts that gave rise to her claims against Coloplast," meaning that Florida law required her to file her claims "no later than December 2013."

The district court denied the motion. It stated that the facts in *Eghnayem v. Boston Scientific Corporation*[7]—a defective vaginal mesh case in which we rejected a statute of limitations defense under Florida law—were "strikingly similar" to the facts of Redding's case and compelled the conclusion that Redding's injuries "were not sufficiently different from the symptoms that could have occurred as a result of the surgeries . . . to put [her] on notice." The case proceeded to trial.

At the close of trial in 2022, Coloplast moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).[8] Coloplast repeated its argument from its motion for summary judgment that Redding's suit was time barred,[9] contending that

---

[7] 873 F.3d 1304 (11th Cir. 2017).

[8] A court may grant a motion for judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed. R. Civ. P. 50(a).

[9] Coloplast raised other arguments as to why the district court should grant its motion for judgment as a matter of law, specifically challenging Redding's negligence claims, failure-to-warn claims, fraud-based claims, and claims for economic damages. And Coloplast argued that Redding failed to introduce evidence justifying the extraordinary remedy of punitive damages. Because Coloplast's additional arguments are not at issue on appeal, we do not address them.

Redding "already knew or at least should have known through the exercise of due diligence" before September 18, 2010, "that she had suffered an injury, and that there was a reasonable possibility that this injury was caused by her mesh implants." It also argued that our decision in *Eghnayem* is inconsistent with Florida law on products liability. In response, Redding contended that she "had no reason to believe she had a lawsuit" in 2010 and that her symptoms were not "sufficiently dramatic" to put her on notice that something was wrong and trigger Florida's statute of limitations.

The district court denied Coloplast's motion for judgment as a matter of law with regard to the statute of limitations (hereinafter the "First Order"). It said that despite Coloplast's view of *Eghnayem*, the case is binding precedent. And it found "the trial record contains sufficient evidence for a reasonable jury to find that [Redding] was not aware of 'an injury distinct in some way from conditions naturally to be expected from' her implantation and that such injury was causally connected to [Coloplast's] products until after September [1]8, 2010" (quoting *Babush v. Am. Home Prods. Corp.*, 589 So. 2d 1379, 1381 (Fla. 4th Dist. Ct. App. 1991)).

The jury then found that Redding's claim had not accrued on or before September 18, 2010,[10] and awarded her $2.5 million in

---

[10] The verdict form specifically asked the jury about the statute of limitations:

> Do you find from a preponderance of the evidence that the Plaintiff knew, or by the use of reasonable care should have known, on or before September 18, 2010, that she had been

12                    Opinion of the Court                    22-13218

damages.    After the district court entered the jury's verdict, Coloplast filed a renewed motion for judgment as a matter of law under Rule 50(b),[11] adopting its prior arguments.  The district court explained that it had "already addressed all of the substantive arguments" in its First Order and incorporated its previous analysis to deny the renewed motion for judgment as a matter of law.

Coloplast appeals the district court's denial of its renewed motion for judgment as a matter of law, specifically arguing that Redding's claims are barred by Florida's four-year statute of limitations.

## II.    Standard of Review

We review a district court's ruling on a renewed motion for judgment as a matter of law *de novo*, "considering the evidence and the reasonable inferences drawn from it in the light most favorable to the nonmoving party." *Eghnayem*, 873 F.3d at 1313.  "[J]udgment

---

injured or damaged and that there was a reasonable possibility that the injury or damages was caused by a defect in the Defendant's products?

The jury answered "no."

[11] "The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion [under 50(a)]." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (alteration in original) (quotations omitted).  "Thus, as with motions under Rule 50(a), the question before a district court confronting a renewed Rule 50(b) motion is whether the evidence is 'legally sufficient . . . to find for the party on that issue.'" *Id.* (quoting Fed. R. Civ. P. 50(a)(1)).

as a matter of law is appropriate only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." *Id.* (quotations omitted).

### III.    Discussion

Coloplast argues that the district court erred in denying its renewed motion for judgment as a matter of law. In essence, Coloplast challenges the jury's finding that Redding's claim was not time barred by Florida's four-year statute of limitations for products liability. Rather, it asserts that Redding knew or should have known with the exercise of due diligence that she had a cause of action against Coloplast before September 18, 2010.

Under Florida's statute of limitations, a plaintiff has four years to initiate a products liability suit. Fla. Stat. §§ 95.11(3)(e), 95.031(2)(b) (2014). The four-year period begins to run "from the date that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence[.]" *Id.* § 95.031(2)(b). The Supreme Court of Florida has explained that "[t]he knowledge required to commence the limitation period, however, does not rise to that of legal certainty." *Univ. of Miami v. Bogorff*, 583 So. 2d 1000, 1004 (Fla. 1991), *holding modified on other grounds, Tanner v. Hartog*, 618 So. 2d 177 (Fla. 1993). Instead, "[p]laintiffs need only have notice, through the exercise of reasonable diligence, of the possible invasion of their legal rights." *Id.* This knowledge "ha[s] two essential ingredients: an injury distinct in some way from conditions naturally to be expected from the plaintiff's condition, *and* . . . exposure to the product in

question."[12] *Babush*, 589 So. 2d at 1381; *see also Eghnayem*, 873 F.3d at 1323 (laying out this framework under Florida law). "Use of the conjunction 'and' in this equation necessarily implies that the connection must be to some extent causal." *Babush*, 589 So. 2d at 1381; *see also Eghnayem*, 873 F.3d at 1323 (same).

    *Eghnayem*, a similar vaginal mesh case, guides our analysis of Redding's case. Like Redding, Eghnayem underwent surgery to

---

[12] Coloplast argues that, rather than rely on the rule presented in *Bogoroff*, we should instead rely on a rule published in *Carter v. Brown & Williamson Tobacco Corp.*, 778 So. 2d 932, 937 (Fla. 2000). In *Carter*, the Florida Supreme Court said that products liability actions accrue "only when the accumulated effects of the deleterious substance manifest themselves [to the claimant], in a way which supplies some evidence of causal relationship to the manufactured product." *Id.* (alteration in original) (quotations omitted). And so, Coloplast argues, applying *Carter* would lead us to conclude that Redding's claim is time barred because she admitted that she thought "something was wrong" in December 2009. But *Carter* addressed "creeping disease cases," which "by their very nature[] involve latent illnesses that are acquired as a result of long-term exposure to injurious substances, where the deleterious effects that give rise to the cause of action may not become symptomatic for many years after the initial exposure." *R.J. Reynolds Tobacco Co. v. Ciccone*, 190 So. 3d 1028, 1038 (Fla. 2016) (quotations omitted); *see Am. Optical Corp. v. Spiewak*, 73 So. 3d 120, 126 (Fla. 2011) (discussing asbestos-related case in the context of "creeping diseases"); *Burkhart v. R.J. Reynolds Tobacco Co.*, 884 F.3d 1068, 1076 (11th Cir. 2018) (acknowledging that *Carter* established a rule "with regard to products-liability actions involving creeping diseases"). Redding's case does not involve a creeping disease acquired over time—it concerns a latent *injury*, and so *Carter* does not apply. Regardless, as we will explain, even if we applied the rule in *Carter*, our conclusion would be the same because *Carter* also focuses on a causal link, and Coloplast cannot prove that Redding had reason to suspect any causal relationship between Redding's 2009/2010 symptoms and the mesh products.

implant a medical device to treat her pelvic problems. *Eghnayem*, 873 F.3d at 1311. Eight months after surgery, Eghnayem visited a doctor who told her "that she had exposed mesh in her vagina."[13] *Id.* The doctor "performed in-office surgery to trim the exposed mesh[.]" *Id.* Roughly three and a half years after the in-office surgery, she visited a second doctor complaining of similar symptoms, and that second doctor found another mesh exposure that needed removal. *Id.* Eghnayem sued the pelvic mesh manufacturer a year later, in part seeking damages for a design defect. *See id.* at 1312, 1324. A jury awarded Eghnayem damages, rejecting the manufacturer's statute of limitations defense based on Florida law. *Id.* at 1312. Affirming the district court's denial of the manufacturer's renewed motion for judgment as a matter of law, we concluded there was a lack of clear evidence that Eghnayem knew "of a dramatic change in [her] condition" or "the possible involvement of the [medical device] in that change . . . four years before she filed suit"—*i.e.*, when a doctor first told her she had

---

[13] Eghnayem's mesh *exposure* differs from Redding's injury of mesh *erosion*. According to Redding's doctors, mesh exposure occurs when a doctor can see "the suture or some graft material in the vagina," whereas mesh erosion occurs when "the mesh destroys the tissue either of the vagina . . . or it does the same to the tissue of the bladder or the urethra." However, the fact that Eghnayem and Redding suffered from slightly different mesh injuries does not change our analysis of whether either of them were on notice of a possible invasion of their rights for purposes of the statute of limitations because our "knowledge" analysis does not focus on the type of injury itself. Rather, it focuses on knowledge of the injury and information that should have put the plaintiff on notice that there was a causal connection between the injury and the product.

mesh exposure. *Id*. at 1324 (first alteration in original) (quotations omitted).

In reaching this conclusion in *Eghnayem*, we looked to *Bogorff*, where the Florida Supreme Court concluded that a young child's symptoms of slurred speech, impaired motor skills, convulsions, a coma, and resulting paralysis and brain damage—which followed the injections of specific cancer medication—constituted "a dramatic change" in the child's condition sufficient to serve as knowledge "for accrual of [the] cause of action." *Id*. at 1323 (quoting *Bogorff*, 583 So. 2d at 1001, 1004). Unlike in *Bogorff*, the facts in *Eghnayem* did not so clearly show "a dramatic change" in Eghnayem's condition. *Id*. at 1324 (quotations omitted). Although Eghnayem "exhibit[ed] one new symptom in 2008—urinary incontinence—that could have been associated with a defect in the [medical device], that symptom was not so obviously unusual as to indisputably put Eghnayem on notice about her claim" because it was not obviously "a sufficiently distinct symptom from what might be expected" post-surgery. *Id*. The manufacturer argued that Eghnayem's testimony—specifically, that she believed in October 2008 that her new symptom "was related to the mesh repair"—was sufficient to establish knowledge and notice for purposes of the statute of limitations. *Id*. (alteration adopted). But we rejected this argument. *Id*. Instead, we concluded that "[u]ltimately, a jury could have reasonably concluded that Eghnayem's injury was not so 'distinct . . . from conditions naturally to be expected from [her post-surgical] condition,' and so the timeliness of Eghnayem's action was

22-11270                  Opinion of the Court                  17

properly a question of fact for the jury."[14]  *Id.* (alteration in original) (quoting *Babush*, 589 So.2d at 1381).

Turning to the case at hand, Coloplast argues that Redding knew or should have known "with the exercise of due diligence" about her cause of action before September 18, 2010, because she experienced the same kind of pain in 2009/2010 as she experienced in 2014 and knew she had a mesh erosion.  *See* Fla. Stat. § 95.031(2)(b) (2014).  But the evidence, viewed in the light most favorable to Redding, was not "so overwhelmingly in favor of [Coloplast] that a reasonable jury could not arrive at a contrary verdict."  *Eghnayem*, 873 F.3d at 1313 (quotations omitted).

---

[14] Coloplast resists our reliance on *Eghnayem* because, in that case, we relied on some medical malpractice cases in our analysis of whether the plaintiff was on notice of a "distinct injury," and medical malpractice cases are subject to a more lenient knowledge standard.  First, we note that Coloplast itself relies on medical malpractice cases in its brief (citing, *e.g.*, *Mobley v. Homestead Hosp., Inc.*, 291 So. 3d 987 (Fla. 3d Dist. Ct. App. 2019); *Gonzalez v. Tracy*, 994 So. 2d 402 (Fla. 3d Dist. Ct. App. 2008)), which severely undermines its argument that such cases are not relevant in products liability matters.  Second, while we acknowledge that the Florida Supreme Court has drawn a distinction between products liability cases and medical malpractice cases in some instances, *see Carter*, 778 So. 2d at 938, it has also relied on medical malpractice cases as comparable analogies in other products liability cases, *see D'Amario v. Ford Motor Co.*, 806 So. 2d 424, 435–37 (Fla. 2001), *overturned by legislative action on other grounds*, 2011-215 Fla. Laws § 2.  Furthermore, *Eghnayem* applied the correct products liability standard in its analysis, while noting that the medical malpractice and products liability contexts are "highly analogous." *Eghnayem*, 873 F.3d at 1324.  We may therefore look to both products liability and medical malpractice cases.

A host of evidence suggests that, in the months following her initial surgery on December 15, 2009, Redding thought that she was experiencing normal, post-surgical complications. Like Eghnayem—and unlike the child in *Bogorff*—Redding's symptoms during her five follow-up appointments between December 28, 2009, and May 10, 2010, did not signal a "dramatic change" in her condition from what would be expected post-implantation surgery. For example, although Redding had an infection, Dr. Weaver explained that infection could result from any surgery. And the tiny, post-surgery erosion was not a sufficiently dramatic change in her recovery condition to cause concern. Dr. Weaver testified that the tiny erosion "never changed" throughout his appointments with Redding and "was never bothering anything." He expected the tiny erosion to heal on its own. We similarly concluded in *Eghnayem* that the singular new post-surgery symptom of urinary incontinence, though "a more dramatic symptom than some," was not "a sufficiently distinct symptom from what might be expected after vaginal surgery to put [Eghnayem] on notice of her cause of action[.]" *Eghnayem*, 873 F.3d. at 1324. In contrast, when the child in *Bogorff* experienced slurred speech, impaired motor skills, convulsions, a coma, and resulting paralysis and brain damage following the injections of cancer medications, the Supreme Court of Florida found a "dramatic change" in the child's condition, sufficient to serve as notice. *Bogorff*, 583 So. 2d at 1001, 1004. Thus, from the trial record, we agree with the district court that there is sufficient evidence for a reasonable jury to find that Redding did not know

about a compensable injury and should not have known with the exercise of due diligence "of 'an injury distinct in some way from conditions naturally to be expected from' her implantation" surgery before September 18, 2010. *See Babush*, 589 So. 2d at 1381 (stating that, under the "should have known" standard in Fla. Stat. § 95.031(2)(b), a plaintiff must have "an injury distinct in some way from conditions naturally to be expected from the plaintiff's condition"); *see also Eghnayem*, 873 F.3d at 1323 (laying out this framework under Florida law).

Further, the evidence does not suggest that Redding had reason to suspect a causal connection between the Coloplast mesh devices and her symptoms between the initial surgery on December 15, 2009, and the statute of limitations cut-off date on September 18, 2010. *See Babush*, 589 So. 2d at 1381 (stating that, under the "should have known" standard in Fla. Stat. § 95.031(2)(b), the connection between the injury and the product "must be to some extent causal"); *see also Eghnayem*, 873 F.3d at 1323 (same). Dr. Weaver never told her that the mesh devices caused her symptoms or were in any way defective, and the record does not show that Dr. Weaver told Redding that the products were causing her harm. *See Stark v. Johnson & Johnson*, 10 F.4th 823, 830–31 (7th Cir. 2021) (concluding that, in the unique context of a vaginal mesh case, summary judgment to the manufacturer on the basis that the claim was time barred was inappropriate because a jury might reasonably find that the plaintiff "did not have sufficient reason to suspect" that "her mesh-related injuries might have been wrongfully caused," in part because "none of [her] physicians

suggested to her that the mesh could be defective").[15]  Contrary to Coloplast's assertions, Dr. Weaver never diagnosed Redding's "tiny erosion" or the mesh products as the cause of any problems during any of his five appointments with Redding between December 28, 2009, and May 10, 2010.  Rather, as we have already explained, Dr. Weaver labeled the tiny erosion as "asymptomatic" multiple times during his testimony and said it was "tiny," about "a millimeter wide."  Further, Dr. Weaver expected this small erosion to heal on its own, and it was exactly the type of minor issue expected following a vaginal mesh implant surgery.  *See Stark*, 10 F.4th at 826, 830 ("It is possible that mesh erosion did not strike Ms. Stark or her physicians as a potential product defect because erosion was a known risk of pelvic mesh implantation.").

In 2014, new symptoms triggered the statute of limitations. When Redding saw Dr. McCarus, she complained for the first time about vaginal bleeding (including postmenopausal bleeding) and pelvic pain.  Dr. McCarus diagnosed Redding's pelvic pain as relating to a larger mesh erosion, "approximately a centimeter" in size.  And Redding presented testimony from Dr. Hoyte that "[t]he source of [Redding's] bleeding [was] a different location than . . . that tiny erosion that was described by Dr. Weaver in 2010."  He testified that erosions may show up years after mesh is

---

[15] The vaginal mesh context presents unique complexities for the patient's knowledge, as it is difficult to distinguish between a normal surgical side effect or complication and a product deficiency.  We find it instructive that, in a recent vaginal mesh case, the Seventh Circuit also considered what a doctor relayed to their patient.  *Stark*, 10 F.4th at 826, 830.

implanted—which, in his opinion, occurred here. Accordingly, from Redding's own testimony and the medical testimony of Dr. Weaver, Dr. McCarus, and Dr. Hoyte, the jury's conclusion—that Redding did not know or should not have known about her cause of action before September 18, 2010—was reasonable.

Coloplast resists our statute-of-limitations conclusion by pointing to Redding's trial testimony that she knew "something was wrong" on or around her December 28, 2009, and January 13, 2010, appointments with Dr. Weaver. Coloplast argues that Redding should be bound by this purportedly unfavorable testimony, even if it is contradicted by her medical records and her doctors' testimony. It relies on *Evans v. Stephens*, where we stated that when a summary judgment nonmovant testifies, "we do not . . . pick and choose bits from other witnesses' essentially incompatible accounts" to help the nonmovant. 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc); *see also id.* at 1284 (Ed Carnes, J. concurring) ("[A]bsent some extraordinary circumstance, no reasonable jury would believe that a party was lying when he said something harmful to his own case."). But *Evans* is a summary judgment case that ensures a nonmovant cannot raise a factual dispute to avoid summary judgment. *See id.* at 1278 ("Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided."). We have never applied the principle in *Evans* to a post-trial renewed motion for judgment as a matter of law, and we decline to do so now.

Juries, unlike judges at the summary judgment stage, are tasked with "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts[.]" *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004) (quotations omitted).  During Redding's trial, the jury was free to accept as credible all, some, or none of her testimony.  *See United States v. Garcia*, 447 F.3d 1327, 1334 (11th Cir. 2006) ("The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury." (quotations omitted)).  And the jury chose not to credit all of it, marking on the verdict form that it did not "find from a preponderance of the evidence that [Redding] knew, or by the use of reasonable care should have known, on or before September 18, 2010, that she had been injured . . . by a defect in [Coloplast's] products[.]"  Despite Coloplast's argument to the contrary, it was reasonable for the jury to give more credit to the medical testimony suggesting that Redding did not discover a mesh-related injury before September 18, 2010.  *See Eghnayem*, 873 F.3d at 1313 ("[J]udgment as a matter of law is appropriate only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." (quotations omitted)).

As a final argument, Coloplast contends that if we are unsure about whether Redding's claim is time barred under existing precedent, we should certify this question to the Florida Supreme Court.  Certifying a question to a state supreme court

rests in this Court's "sound discretion." *Lehman Brothers v. Schein*, 416 U.S. 386, 390–91 (1974). We may certify a question if we "maintain more than 'substantial doubt' as to how the issue . . . would be resolved under [state] law." *Toomey v. Wachovia Ins. Servs., Inc.*, 450 F.3d 1225, 1231 (11th Cir. 2006). Because there is no substantial doubt as to how to apply the Florida statute of limitations to this case, particularly in light of *Eghnayem*, a case with remarkably similar facts and legal issues, we decline to certify the question to the Florida Supreme Court.

In sum, we conclude that the evidence, viewed in the light most favorable to Redding, did not overwhelmingly establish that she knew or should have known about a compensable injury arising out of Coloplast's mesh before September 18, 2010, such that a reasonable jury could not conclude otherwise. *See Eghnayem*, 873 F.3d at 1313 ("[J]udgment as a matter of law is appropriate only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." (quotations omitted)). As a result, Redding's claims were not time barred under Florida's four-year statute of limitations.

## IV.    Conclusion

Based on the above, we affirm the district court's denial of Coloplast's renewed motion for judgment as a matter of law.

**AFFIRMED.**